[No. D059540. Fourth Dist., Div. One. July 6, 2011.]

SAMANTHA T. et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY et al.,
Real Parties in Interest.

### COUNSEL

Children's Law Center of Los Angeles, Patricia G. Bell; Dependency Legal Group of San Diego and Carolyn Griesemer for Petitioners.

No appearance for Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips and Gary C. Seiser, Deputy County Counsel, for Real Party in Interest San Diego County Health & Human Services Agency.

Children's Law Center of Los Angeles and Tyson B. Nelson for Real Party in Interest Michael T.

Children's Law Center of Los Angeles and Lori Schroeder for Real Party in Interest Ashley T.

### OPINION

**BENKE, Acting P. J.**—In this writ proceeding we are called upon to interpret and apply the provisions of Welfare and Institutions Code section 362.7,[1] which permit a county health and human services agency to place a dependent child in the home of a "nonrelated extended family member" (NREFM). Under the terms of the statute, a NREFM is anyone "who has an established familial or mentoring relationship with the child." As we explain, the record here will not support the juvenile court's determinations a family friend of the minors' mother is a NREFM and that the placement with the family friend is in the best interest of the minors.

### SUMMARY

We interpret section 362.7 in light of findings the Legislature made at the time it enacted its statutory predecessor, which permitted NREFM placements as a pilot project in counties selected by the Judicial Council. Under the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

express terms of the statute and the earlier findings of the Legislature, we have no difficulty concluding someone who has a close relationship with a dependent child such that the relationship will provide the child with familiar adults in familiar surroundings is a NREFM. Additionally, in light of the Legislature's findings, persons who have a close relationship with a child's family, rather than the child, might also be NREFM's under limited circumstances. The Legislature's findings suggest that where placement will enhance the goals of family reunification or where the proposed NREFM's have a similar ethnic or racial identification so the child will be placed with a family sensitive to the child's background, a NREFM placement may be appropriate even if the only connection is between a NREFM and a minor's family. However, under our child dependency scheme, even when a person falls within the scope of the NREFM statute, an order placing a child with the NREFM must be in the best interest of the child.

Here, counsel acting on behalf of two dependent minors, Samantha T. and Emily T., challenges an order under section 362.7 placing them in the home of Megan W., a woman the juvenile court found to be a NREFM. Admittedly, the record shows Megan and her family have a long-standing and close relationship with the minors' mother, real party in interest Ashley T. and her family. However, notwithstanding that relationship, Megan does not qualify as a NREFM because she does not have a close relationship with the minors themselves. Moreover, this is not a case in which we can consider extending the statute beyond its express terms because the placement here was not made in order to either enhance family reunification or as a means of placing the two minors in a home sensitive to their backgrounds.

Even if Megan were a NREFM, the record here shows placement in her home would not be in the best interest of the minors. At the time of the challenged order, reunification services for the minors' parents were terminated and a permanent placement hearing under section 366.26 was set. The record shows there are 28 local qualified families willing to adopt the minors as a sibling pair. Thus, although the current foster mother is, due to her age, unable to adopt the minors, placement with Megan is not the only opportunity to establish a permanent home for the minors.

Both of the minors' parents, Ashley T. and real party in interest Michael T., were charged with felony child endangerment. (Pen. Code, § 273a, subd. (a).) The charges stem from the death from starvation of their 15-month-old son Aiden. Importantly, however, the record discloses Samantha was herself subjected to serious neglect in the form of profound and long-enduring

hygiene and housekeeping deficiencies.[2] No doubt as a result of Samantha's experience with her natural parents and the death of her infant brother, the record shows Samantha is not comfortable with her natural parents and reacted very negatively to the prospect of moving to the home of her mother's friend Megan.

On the other hand, the record also shows the children, and in particular Samantha, have bonded to their foster mother and Samantha has an ongoing relationship with a local psychological therapist who opined it was not in Samantha's best interest to place her with Megan. Because Megan lives 500 miles away in Sacramento, placement with her would foreclose the opportunity for the minors to maintain these important relationships as they transition into a permanent placement.

Although Megan assured the social worker and the juvenile court she would act to protect the children from their natural parents, she conceded it would be hard to do so. The record fully supports Megan's frank concession as to the difficulty she would face in raising her family friend's children: Megan's home in Sacramento is just a few houses away from the minors' mother's family; Megan's mother lives in her home and is quite close to the minors' maternal grandmother; Megan has maintained a close and relatively intimate relationship with the minors' natural parents. Given the history of neglect which led the juvenile court to detain the minors and the serious criminal proceedings pending against the minors' parents, Megan's very close ties to the minors' parents and their family present obvious and serious risks to Samantha's emotional stability and well-being.

Real party in interest San Diego County Health & Human Services Agency (the agency) argues the minors would benefit over time from the access to members of their natural extended family that Megan could provide. But the record clearly establishes that benefit is far outweighed by the immediate disruption to relationships which are important to the minors at this point in their lives and the potential for conflict between Samantha's emotional needs and the needs of the extended family, with whom Megan is closely and intimately connected. Accordingly, we grant the petition.

## FACTUAL AND PROCEDURAL HISTORY

### 1. *Maryland*

Samantha was born in November 2006. At that time her mother Ashley was serving in the United States Navy, where she worked as a dental

---

[2] The younger minor, Emily, was detained shortly after her birth.

hygienist. Michael, Samantha's father, worked prior to Samantha's birth, but following Samantha's birth he left his job and became Samantha's principal caretaker.

There is nothing in the record with respect to Samantha's care or social situation during the first 16 months of her life. However, the record shows her family began living in military housing in Maryland in March 2008 and the property manager at the housing site reported that from the time the family moved into their apartment until they left in August 2009 there were housekeeping and sanitation issues. The property manager reported downstairs neighbors complained on more than one occasion about the foul odor of Ashley and Michael's apartment and when the property manager opened the front door of the building where the family lived she could smell the odor. The property manager noted the family had a cat and the manager believed the cat urinated on the carpet in the apartment.

Ashley delivered a second child, Aiden T., in June 2008. Aiden was born six weeks premature and had a small puncture in his lung and a small hole in his heart. Aiden was released from the hospital at six weeks.

Military medical personnel who treated Aiden in Maryland over the following year made and documented the following observations: while Aiden was in Ashley and Michael's care, Aiden did not gain weight. However, when, on repeated occasions, Aiden's failure to gain weight required hospitalization, Aiden gained weight. Moreover, despite repeated attempts over the course of a year, military physicians were unable to identify any medical explanation for Aiden's inability to gain weight while in Ashley and Michael's care. Over time, Aiden began exhibiting signs of severe developmental delays.

In addition to being unable to determine the cause of Aiden's failure to gain weight, military medical personnel noted and were concerned about the family's hygiene and the care both Samantha and Aiden were receiving. In October 2008, in response to concerns of medical personnel, a Maryland social worker inspected Ashley and Michael's home. Although the social worker did not find any evidence of abuse, the apartment was disheveled, the living area was extremely soiled and the social worker had concerns about the family's hygiene.

One of Aiden's treating physicians later told a Naval Criminal Investigative Service (NCIS) investigator: "During my first visit with Aiden and the family, I did become concerned about the social situation and possible neglect, as the entire family exhibited very poor hygiene and Aiden was dressed in soiled clothing and had a very strong odor about him." The physician reported that

when Aiden was hospitalized in December 2008, he was diagnosed with recurrent impetigo which physicians thought was due to "persistent poor hygiene." The physician stated: "During my time caring for Aiden, I continually had concerns regarding medical neglect due to persistently poor hygiene of the entire family, odd family dynamics and inconsistent weight gain despite maximum medical therapies."

A physician reported to a social worker that during one visit Aiden was covered in dry feces and Samantha's hair appeared matted. Another physician reported that at a visit to the hospital both parents had a strong body odor and Michael was dressed in soiled clothing, as was Aiden, who was wrapped in a dirty baby blanket which had dried body fluid stains. The physician reported Samantha was also dressed in soiled clothing. Because of the duration of that visit, Samantha became hungry and neither Ashley nor Michael could afford to buy her food. The physician used her own money to buy orange juice, JELL-O, pudding and milk for Samantha. It appeared to the physician Ashley and Michael expected other people to feed their children at the hospital.

As a means of providing Aiden nourishment, in February 2009 physicians placed a nasogastric feeding tube (NG tube) in Aiden and instructed Michael to put designated amounts of formula into the NG tube on a daily basis. At an early August 2009 visit, the physician reported that Aiden appeared to be doing well but still had suboptimal weight.

At the August 2009 visit, Ashley and Michael advised the physician Ashley was ordered to report for duty to San Diego in September and they planned to spend time with their families in Sacramento before moving to San Diego. The physician gave Ashley and Michael complete and specific instructions with respect to Aiden's feeding and medication. Although Aiden was scheduled to visit the Maryland physician one more time before the family left for California, Aiden missed the appointment.

2. *Sacramento*

On September 11, 2009, Ashley, Michael and their children were staying with Michael's family in Sacramento. Michael later reported he had substantially reduced the amount of formula he was putting in Aiden's NG tube because Aiden was sick and spitting up his food. Michael nonetheless reported he gave Aiden formula and Pedialyte that day and regularly before that day.

Michael reported that on September 11 he heard Aiden throw up, went to check on his son in a playpen and found Aiden covered in formula, but otherwise doing well. Michael stated he went to start a bath and when he came back three to five minutes later, Aiden was blue. According to Michael, he and Ashley both administered cardiopulmonary resuscitation (CPR) to Aiden, while Michael's father called 911 and asked for emergency medical assistance. Paramedics took Aiden to a local hospital where he was pronounced dead in the emergency room.

Ashley fully supported Michael's version of the events surrounding Aiden's death. However, there are a number of circumstances which cast doubt on that account. Michael's father advised the 911 emergency dispatcher Aiden was in a catatonic or dead state and Aiden was staring ahead, was stiff and would not respond. This description of Aiden's condition was confirmed by a paramedic who arrived at the scene and found Aiden "stiff with his eyes wide open." The paramedic believed Aiden was dead for at least an hour before the 911 call was received.

Significantly, an autopsy of Aiden found he was severely dehydrated and there was no food in his stomach or small intestine. The pathologist who performed the autopsy stated Aiden was "a prune." The pathologist further believed: "The problem was someone didn't want to take care of this kid." "I think that he was just not paid attention to." "He was so severely dehydrated, it appeared that he wasn't dealt with for a couple of days."

3. *San Diego*

Shortly after Aiden's death, Ashley, Michael and Samantha moved to San Diego. Law enforcement officials in Sacramento as well as the NCIS began an investigation of Aiden's death.

In February 2010, Melissa T., Michael's sister, came to San Diego for a visit. Evidently, she found Ashley and Michael's home needed to be cleaned and she took it upon herself to clean the home.

By May 2010, investigators in Sacramento determined Ashley and Michael were responsible for Aiden's death and filed a complaint alleging they were both guilty of violating Penal Code section 273a, subdivision (a). In May 2010, Ashley and Michael were arrested in San Diego and Samantha was taken into custody by the agency.

At the time the agency took Samantha into its care, it found Ashley and Michael's home was once again filthy. According to the social worker who took Samantha into custody: "The floor was covered with food, trash, clothes, toys, plates, utensils, and various debris. This worker found it difficult to walk through the living room and into the kitchen. All rooms of the home were in this condition and multiple pictures were taken. The rug and floors had various stains/were heavily soiled. There were dirty dishes piled up in the kitchen and evidence that food had been made and left out (i.e. open cans/boxes of food lying on the counter).

"The bathrooms were dirty with trash and debris. The downstairs bathroom had a frying pan on the counter. The upstairs bathroom had clothes, food, and dirty sanitary napkins on the counter. There was a bloody pair of what appeared to be adult underwear in the sink. There was a slice of pizza (with bites) sitting directly next to the bottom of the toilet."

The social worker was "unable to walk into the parent's bedroom due to the piles of clothes and debris. The child's room was sparsely furnished, with no sheets or pillow case on the child's bed. The pillow was stained yellow and did not have a case on it. The child's closet was bare except for stuffed animals which were covering the floor.

"There was an aroma of urine throughout the home, specifically upstairs and in the bathrooms."

Although Samantha had a bright affect and did not appear fazed by the condition of the home or the presence of police, her hair was matted, her clothes were dirty and her feet were gray and black.

Michael's sister Melissa returned to San Diego immediately after Samantha was taken into custody by the agency and observed Ashley and Michael's home. She reported to the social worker the home was "way worse" than it was when she cleaned it in February 2010 and it appeared it was not cleaned since then. Melissa also confirmed the Maryland physician's report of an odd family dynamic: according to Melissa, Ashley does not appear to care for Samantha's needs and when "Samantha would call out or reach out the mother would call the father who would be in another room."

A social worker also interviewed a cousin, Suzanne R. Suzanne reported she never saw their home, but talked to Ashley and Michael about cleaning a home because she knew they had poor housekeeping skills. Suzanne was in the homes of both Ashley's relatives and Michael's relatives and reported both sides of the family have housekeeping issues.

The agency filed a dependency petition with respect to Samantha which alleged Ashley and Michael did not provide Samantha with a suitable home and they caused the death of Aiden. (§ 300, subds. (b), (f).)

The following month the juvenile court sustained the petition and denied reunification services. (§ 361.5, subd. (b)(4).) A few weeks after her initial foster care placement, Samantha was moved to a second foster home because of complaints the agency received about the first foster home. Samantha is presently in the second foster home.

Following Samantha's detention, both Ashley and Michael participated in therapy. In November 2010 Ashley's therapist reported Ashley "is very rigid, she has hunkered down and is not moving her perspective that she did everything possible to assist her son and that his health problems were the main issue. She reported that the mother has no insight regarding the situation, specifically regarding the impact of hygiene on the health and safety of . . . Samantha. She stated that the mother has a poor frame of reference."

As of November 2010, Michael's therapist reported that his concern about Michael's hygiene was increasing. The therapist reported Michael came to his last therapy session unshaven, disheveled and with an odor and was uncomfortable when the therapist raised hygiene issues.

### 4. *Emily*

Ashley was pregnant at the time Samantha was detained and in November 2010 delivered a full-term infant, Emily T. Shortly after Emily was born, the agency filed a sibling petition under section 300, subdivision (f) with respect to Emily, the petition was sustained and Emily was placed with a foster family until February 1, 2011, when she was placed with the foster mother who is caring for Samantha.

By all accounts, Samantha and Emily are doing well in the foster mother's care. Although the foster mother is 70 years old and is not in a position to adopt the children, she has agreed to care for the girls until a permanent placement can be made. The foster mother has enrolled Samantha in a local Head Start program and Samantha seems to be doing well in the program. The foster mother reports Samantha very much enjoys her role as big sister to Emily. In addition to the care provided by the foster mother, Samantha has also been receiving psychological therapy with Emily K. McCutchan, a licensed marriage and family therapist.

According to the social worker, Samantha has become very attached to the foster mother, whom she calls "gramma." On the other hand, Samantha

manifests a noticeable level of anger toward her parents. Her social worker reported: "Although Samantha enjoys her weekly visits with her parents for the most part, the [foster mother] and visitation center have reported comments and behaviors of Samantha before and/or after the visits with the [parents] that are also concerning and indicate Samantha has gone through some trauma in her childhood with [the parents]. Samantha has not wanted to attend visits with her parents on more than one occasion but does so as encouraged by the [foster mother] and [Family Visitation Center] monitor. Samantha has made comments to the caregiver that she would like the caregiver to stay with her during the visits with [her parents] because 'they are mean' or 'they will smack me on the head'. At times Samantha shies away from affection from her parents or will only reciprocate, not initiate affection with them. . . . The [foster mother] has reported throughout the case that Samantha has had nightmares and has reported that [her father] is chasing her through the house and up the stairs and she is scared. These reactions and comments are concerning."

The social worker assigned to Samantha's case in the fall of 2010 reported that during supervised visits with Samantha and Emily between November 30, 2010, and February 1, 2011, in general Ashley and Michael acted appropriately. However, during a visit in December 2010, Michael told the foster mother she should not get used to keeping Samantha because Ashley and Michael's best friends in Sacramento were being evaluated for placement and would be approved. Later at a visit on January 20, 2011, Ashley and Michael stated, in Samantha's presence, this would be their last visit at the family visitation center because the following week they would all be up in Sacramento.

Samantha reacted poorly to the idea of moving to Sacramento. When Ashley and Michael first mentioned the potential move to Sacramento, Samantha stated: "I've already been to Sacramento, I don't want to go there again." Following a January 25, 2011, visit with Ashley and Michael, Samantha was very upset on the way back to the foster mother's home and told the foster mother: "I don't want to go with Mikey and Ashley. . . . I want to stay with you gramma!" According to the foster mother, Samantha was so upset she threw up in the foster mother's car.

5. *Megan*

According to her social worker, "Samantha is assessed as a highly, generally adoptable four year old little girl due to her ethnicity of Caucasian, good general health, on target developmental standing, sweet disposition and due to her ability to attach." The social worker further reports that there are 28 local, approved adoptive families willing to adopt a sibling set of children with Samantha's and Emily's characteristics.

Notwithstanding the availability of local adoptive parents, since November 2010 the agency has focused its attention on the Sacramento home of Megan and her husband John W. as a permanent placement for the minors. The record discloses Megan and Ashley are quite close and Ashley and Michael describe Megan and John as their best friends. Ashley's mother and Megan's mother are friends; Ashley, Ashley's sister Angelina and Megan grew up together and think of each other as sisters. Ashley and Megan talk to each other five to six times a month and text each other regularly.

Megan's mother lives with Megan and John on the same street as Ashley's family. Ashley's family is about two minutes away from Megan's home and Megan sees them at least three times a week. According to the social worker, Megan and John are interested in adopting Samantha and Emily because they think of the girls as their family and "would do anything for our family." In January 2011, Ashley visited Megan to see how Megan and John prepared their residence for Samantha and Emily's arrival.[3]

In conversations with the social worker, Megan stated she understood that if she became the girls' adoptive parent she would have to protect them from Ashley and Michael. Megan assured the social worker, "Although it would be hard, I've already talked with Ashley that if it came down to the girls not wanting to see [Ashley and Michael] or being upset about visiting with them, the visits would stop. I have explained that the girls are our first priority."

On February 22, 2011, the juvenile court set a date for a contested section 366.26 hearing terminating Ashley and Michael's parental rights. At the request of Ashley's counsel, the court set a special hearing to address placing the children with Megan and John as NREFM's.

At the contested special hearing on April 6, 2011, Samantha's therapist McCutchan and the foster mother opposed the proposed placement with Megan and John.

McCutchan, who testified telephonically, opined that it would be detrimental to Samantha's emotional development to be moved from the foster mother's care at that point in time. McCutchan said Samantha was "at a very critical stage in her development." McCutchan explained that while living with the foster mother, Samantha was able to begin to heal from the trauma of living in an unsafe home environment with her parents, and it was important to continue her recovery there.

---

[3] Consistent with all the other information in the record about the relationship between Megan and John and Ashley and Michael, when, following the juvenile court's order, Megan and John came to San Diego to be introduced to Samantha and Emily, they stayed with Ashley and Michael.

McCutchan believed the longer Samantha continued to live with the foster mother the better her chances would be to build a foundation of trust that will help her live a good life. McCutchan testified Samantha told her she did not like her parents; according to McCutchan, Samantha did not mention Megan during therapy.

McCutchan also testified she has developed a therapeutic relationship with Samantha and she believes the play therapy she and Samantha engage in is helping Samantha process many of her emotional issues, including in particular the loss of her baby brother. McCutchan was concerned about putting Samantha in a position in which, at this point in her development, she was required to establish a new therapeutic relationship.

The foster mother corroborated McCutchan's testimony about McCutchan's relationship with Samantha. The foster mother stated that when Samantha sees McCutchan, she jumps up and down and says: "Dr. Emily, Dr. Emily!"

The foster mother testified when she took Samantha home after a visit with her parents on March 11, 2011, the child started to cry. Samantha was upset because Ashley told her she was moving to Sacramento with Megan. Samantha had nightmares that night and the following night. On March 12, Megan telephoned the foster mother's residence and was allowed to say hello to Samantha, who sang the "A, B, C's" to her. According to the foster mother, "[t]here was not any real conversation back and forth."

Minors' counsel's investigator testified when she spoke with Samantha the child said she never saw Megan. When Anderson asked Samantha how she felt about living with Megan, Samantha "kind of just changed the subject."

Megan, who also testified telephonically, stated she was familiar with Samantha, having seen her "a little over . . . 20 times" at events such as birthday parties, pool parties and family get-togethers. Prior to the hearing, Ashley sent Megan a number of photographs of Samantha and Megan at various family functions and at the hearing, Megan testified about the photographs and her very close relationship with Ashley and her family. At the time of the hearing, Megan had not met Emily.

Megan testified she understood the protective responsibilities of an adoptive parent and would do what was best for the children. If that included protecting Samantha and Emily from their parents, she would do so even if such action ended her relationship with Ashley and Michael. Megan said if the children were in her care, they would be her children and she would "do what it t[ook] to protect them and keep them safe."

The juvenile court found Megan was a NREFM. The juvenile court further found the children would benefit from a placement which permitted

them to know their extended family members. The court gave the agency discretion to place Samantha and Emily with Megan and scheduled a joint section 366.26 hearing for both children.

The minors, through their counsel, filed the instant petition for a writ of mandate challenging the juvenile court's order permitting the agency to place the children with Megan and John. We issued an order to show cause and stayed the juvenile court's order permitting placement with Megan and John.

### 6. *Postorder Proceedings*

At its request, we have permitted the agency to augment the record with a report on visits between Megan and John and the children which took place here in San Diego following our order staying the juvenile court's order. We have also permitted the minors' counsel to submit statements from the foster mother and Samantha's therapist with respect to their views about the visits. These additions to the record show that during the initial visit Samantha did not recognize either Megan or John and that while they were in San Diego, Megan and John stayed with Ashley and Michael. It also became apparent during the visits that although Megan and John are aware Aiden died, the only information they have about the cause of his death has been provided to them by Ashley and Michael. The social worker explained the agency planned to make Megan and John aware of the circumstances surrounding Aiden's death at the time of placement with Megan and John. After meeting with Megan and John, the foster mother and the social worker, McCutchan expressed renewed concern about placing the children in Megan and John's home in light of Megan and John's obviously close relationship with Ashley and Michael.

Following argument in this court on our order to show cause and our consideration of the additional documents[4] offered by the parties, we ordered the agency to suspend any further contact between the minors and Megan and John.

---

[4] We recognize in other contexts we may not consider postjudgment or postorder documents. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413 [2 Cal.Rptr.3d 683, 73 P.3d 541] [appellate court may not rely on postjudgment declaration in reversing order terminating parental rights].) Here, however, we permitted augmentation with respect to the visits by Megan and John because the documents were relevant to our determination a further stay, suspending contact between Megan and John and the minors, was necessary.

We also augment the record before us with the court minute order of April 6, 2011. (Cal. Rules of Court, rule 8.410(b)(1).) In addition, we grant the request of minors' counsel to take judicial notice of the November 15, 2010, detention report of Emily and the agency's request to take judicial notice of Emily's adoption assessment report filed below on April 15, 2011. (Evid. Code, §§ 452, subd. (d), 459.) We have only considered the adoption assessment to the extent it sets forth circumstances which occurred before the order permitting placement with Megan and John was entered.

DISCUSSION

I

Section 362.7 provides: "When the home of a nonrelative extended family member is being considered for placement of a child, the home shall be evaluated, and approval of that home shall be granted or denied, pursuant to the same standards set forth in the regulations for the licensing of foster family homes which prescribe standards of safety and sanitation for the physical plant and standards for basic personal care, supervision, and services provided by the caregiver.

"A 'nonrelative extended family member' is defined as any adult caregiver who has an established familial or mentoring relationship with the child. The county welfare department shall verify the existence of a relationship through interviews with the parent and child or with one or more third parties. The parties may include relatives of the child, teachers, medical professionals, clergy, neighbors, and family friends."

When, as here, a child has been removed from a custodial parent's care under the provisions of section 361, the social worker may place the child in the approved home of an NREFM as defined in section 362.7. (§ 361.2, subdivision (e)(3).) As the minors' counsel argues, any placement under section 362.7 is subject to the requirement it be in the child's best interest. (See § 361.3, subd. (a)(1).)

The statutory predecessor of section 362.7 was enacted in 1995 as a pilot project. (Stats. 1995, ch. 509, § 6, p. 3936.) The legislative history of the pilot project indicates the overall goal of the Legislature was to encourage placement of children "with competent familiar adults, in familiar surroundings, while ensuring the safety and well-being of the children." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1262 (1995–1996 Reg. Sess.) Apr. 18, 1995.) In enacting the pilot project the Legislature made, among others, the following findings: "Sec. 3. It is the intent of the Legislature to encourage foster home placements in the communities where the minors have been raised through the creation of opportunities for placement of children with persons who, while not relatives, have a close relationship with the dependent minors.

"Sec. 4. It is also the intent of the Legislature to implement the nonrelative extended family category to enhance the goals of family reunification.

"Sec. 5. It is further the intent of the Legislature to provide community foster care with nonrelative extended family ties to enhance the possibility

that minors will be placed with foster parents of like ethnic or racial identification and with a foster family that is sensitive to the child's background, particularly in the case of children who are bilingual or monolingual in a language other than English." (Legis. Counsel's Dig., Sen. Bill No. 1262 (1995–1996 Reg. Sess.) 5 Stats. 1995, Summary Dig., p. 185.)

By its terms, the original version of section 362.7 was repealed as of January 1, 2001. (Stats. 1995, ch. 509, § 6, p. 3936.) The current version, which in material parts re-enacted the original definition of NREFM's,[5] was added by the Legislature and became effective on October 10, 2001. (Stats. 2001, ch. 653, § 12, p. 5204.)

II

The first question we confront is whether Megan is a NREFM as defined by section 362.7, such that placement under section 361.2, subdivision (e)(3) was permissible.

█ Minors' counsel argues Megan does not meet the statutory definition of an NREFM because she does not have a familial or mentoring relationship *with* either Samantha or Emily. The agency has conceded Megan does not have an established relationship with either child. In an addendum to the report she prepared for the NREFM hearing, the social worker wrote: "[A]lthough there is no mentoring or fostering relationship between the NREFMs and Samantha and Emily, the NREFMs do have a familial relationship with [Ashley and Michael]." The social worker went on to explain the historical connection between Megan and Ashley and the reason there was no relationship with the children was they lived in different states and cities. The social worker continued: "However, it is reasonable to assume that if the

---

[5] The original version of section 362.7 provided in part: "(a) The Judicial Council shall establish a pilot project to allow a child subject to placement in a foster home to be placed in the home of a nonlicensed, nonrelative extended family member. The pilot project shall include up to five counties, as selected by the Judicial Council, in which the county department of social services and the juvenile court jointly agree to participate, with one being Santa Clara County, and of the remaining four counties, two shall be rural. If fewer than two rural counties apply, the department may select nonrural counties.

"(b) For purposes of the pilot project:

"(1) 'Nonrelative extended family member' includes any of the following:

"(A) The godparent or godparents of a child subject to placement.

"(B) Any adult caretaker who has an established familial relationship with the minor. This shall be verified by interviews with one or more third parties. These parties may include, but need not be limited to, relatives who are not included in the extended family home, teachers, medical professionals, clergy, neighbors, and family friends.

"(2) 'Nonrelative extended family home' means the home in which the nonrelative extended family member resides and in which the minor is being placed as an alternative to foster care." (Stats. 1995, ch. 509, § 6, p. 3936.)

children were in the custody of [Megan and John], as the children grew older, they would develop and have a familial relationship with the NREFMs."

Moreover, the agency has acknowledged minors' counsel is correct the "familial or mentoring" relationship in the NREFM statute "must be with the child." However, the agency argues that we should not require the child be able to cognitively recognize a proposed NREFM, because such a requirement would prevent infants, such as Emily, from gaining the benefits of a NREFM placement.

We are sympathetic to the agency's concerns a narrow interpretation of section 362.7 might prevent placements which are otherwise consistent with the Legislature's intention and the best interests of particular dependent minors. However, we are constrained not only by the express language of the statute but by the available Legislative history. Although that history suggests under certain circumstances a relationship with a minor's family, rather than the minor herself, might meet the goals of the statute, those circumstances do not appear on this record.

Plainly, because Megan does not have a relationship with Samantha or Emily, she does not qualify under the express terms of the statute or within the goals of the statute as expressed in the Senate Committee analysis of the 1995 enactment. There is no dispute Megan does not offer the minors care from a familiar adult or in familiar surroundings.

Arguably, based on the Legislature's findings with respect to family reunification and racial or ethnic identification, a familial relationship with a minor's family, even in the absence of a relationship with a minor, might be sufficient to meet the requirements of section 362.7. If, for instance, family reunification were a viable option here, moving Samantha and Emily into Ashley and Michael's broader extended family might improve the prospects of reunification. However, as we have noted, here reunification services have been terminated and it is no longer available as a permanent plan.

Similarly, were Samantha or Emily members of a racial or ethnic minority, a willing member of such a minority community who had a relationship with their family might be able to provide the sensitive care the Legislature expressly hoped to promote. As we have seen, however, as Caucasians for whom there are 28 approved adoptive local families, Megan does not offer any needed racially or ethnically sensitive care.

In sum then, we agree with minors' counsel that Megan, who is unfamiliar to both children, is not a NREFM within the meaning of section 362.7.

### III

We have set forth in some detail the available social history and psychological conditions of Ashley, Michael, Samantha and Emily because even if we were able to interpret section 362.7 in a manner which permitted us to find Megan is an NREFM, the record here will not support a finding a placement in her home is in the best interest of the minors. In reaching this conclusion, we are in no respect critical of Megan and John. Their generosity and genuine concern for Samantha and Emily is evident in the record and is to be commended. In particular, we do not question Megan and John's willingness to protect the minors, at whatever cost, from their best friends, the minors' parents. However, in the end, given the availability of other local adoptive parents, at this juncture the best interests of the minors require a less disruptive and conflicted local placement where there is no need to exact from prospective parents such a painful and costly commitment.

■ In placing a child with a relative, section 361.3, subdivision (a)(1) requires the agency consider, among other matters, "[t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs." Although relatives as defined in section 361.3 do not include NREFM's (§ 361.3, subd. (c)(2)), given the preference provided by the statute to relatives, implicit in the statutory scheme is a requirement any NREFM placement also be in the best interest of the child. "The question before the juvenile court at the hearing on change of placement was, at bottom, to determine whether a change of placement was in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 321 [27 Cal.Rptr.2d 595, 867 P.2d 706]; see also *In re Jessie G.* (1997) 58 Cal.App.4th 1, 8 [67 Cal.Rptr.2d 811] [best interest is "implied throughout dependency law"]; *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165 [53 Cal.Rptr.2d 93] [best interest is "inherent in the legislative procedure"].)[6]

Here, the record shows in a very convincing fashion that during the first three and one-half years of Samantha's life, Ashley and Michael neglected her as well as Aiden. The record also shows that although Samantha was emotionally compromised by Ashley and Michael's conduct, she has benefited in meaningful ways from the care provided to her by her foster mother and therapist. Samantha has quickly bonded to her foster mother and looks to her for protection from Ashley and Michael. The record also shows Samantha has developed a needed and positive therapeutic relationship with McCutchan.

---

[6] We also recognize the statutory preference for keeping siblings together when possible. (§§ 306.5, 361.2, subd. (i), 362.1, subd. (b), 16002, subd. (b); see also Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2011) § 2.129[7], pp. 2-384 to 2-385 (Seiser & Kumli).) Here, this preference requires that we treat risks or harm which impact Samantha as also impacting Emily.

Although we agree with the agency that notwithstanding the positive relationship Samantha has with her foster mother, that relationship will have to change because of the foster mother's age, it does not follow the children's best interests are promoted by a placement with an individual who is unknown to these children and resides several hundred miles away. Because these children are highly adoptable and 28 local families have been identified as viable adoptive parents, there are many options available for these children when they must be transitioned from the foster mother's home.

The record also shows there are substantial risks in placing Samantha in Megan and John's care. As noted by the foster mother, Samantha is very uncomfortable visiting Ashley and Michael and has told McCutchan she does not like her parents. Given Samantha's feelings, a placement in Ashley and Michael's extended family is quite problematic. In that setting, there are plainly risks of serious conflict between Samantha, who has a very negative view of her parents, no doubt based on her experience with them, and Megan and John, who it appears from the record have a far more benign view of their best friends.

There are also plainly risks of conflict between Megan and John and their extended family. The statements Michael and Ashley have made to the foster mother and Samantha to the effect that "we will be going to Sacramento" suggest Michael and Ashley expect to continue to play a role in Samantha's and Emily's lives. Given Samantha's current emotional state, such a role does not appear to be in her best interest and thus there is a very real possibility Megan and John will have to honor their commitment to limit or end their relationship with Ashley and Michael. Given Megan's lifelong and continuing close relationship with Ashley's family, we must conclude doing so will be traumatic for them and for Samantha, who would be in the middle of such a conflict. Where, as here, there are alternative placements available, it is not in Samantha's interest to place her in a home where there is a real risk that she, and the prospective parents, are likely to be required to endure such conflict and loss.

Despite the potential for harm in placing Samantha in Megan and John's Sacramento home, the agency argues the opportunity to be raised near their extended family offers potential long-term benefits to Samantha and Emily which the juvenile court could reasonably determine outweigh the risks of the proposed placement. On the particular facts presented in this record, we are unpersuaded.

■ Once the juvenile court has determined reunification is no longer possible, the most pronounced reason for trying to maintain family ties terminates as well. (See *In re Lauren R.* (2007) 148 Cal.App.4th 841, 854–855 [56 Cal.Rptr.3d 151] [relative placement preference of § 361.3 does not override child's interest in continuing stable nonrelative placement].) Admittedly, even where reunification is no longer a reason to preserve family ties, access to relatives may still be one factor a court considers in making permanent placement decisions. (See *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032 [111 Cal.Rptr.2d 243]; Seiser & Kumli, *supra*, § 2.127[3], p. 2-346.) However, at that point the juvenile court's focus must be on the child's needs and best interest and the benefit to be derived from contacts with relatives must be weighed against the child's other needs. (See *In re Stephanie M., supra*, 7 Cal.4th at pp. 320–321; *In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826].)

We of course agree with the agency that, as a general proposition, providing adoptive children with access to members of their natural family may be quite valuable to them as they mature. However, that general proposition cannot blind us to the very specific realities of the record before us. Here, in light of these realities the benefit in maintaining ties with Ashley's and Michael's respective families is uncertain. We note Samantha's brother died while he and Ashley and Michael were visiting a member of the extended family, serious criminal charges are now pending against her parents, two members of that extended family, and Samantha has clearly expressed her unwillingness to go to Sacramento. Any benefit to be derived from access to the relatives is dependent on how well the children transition to placement with Megan and John and how, in the future, the extended family responds to the girls and their particular needs in light of all that has transpired and may transpire in the future. In light of Samantha's immediate need to recover from the manner in which she was treated for the first three and one-half years of her life, on this record the uncertain benefit of future family contact does not outweigh the immediate costs and definite risk of placement with Megan and John.

## DISPOSITION

Because Megan is not a NREFM within the meaning of section 362.7 and because, in any event, a placement with Megan and John would not be in the minors' best interest, the juvenile court abused its discretion in permitting the agency to make a placement in their home.

Let a writ issue directing the juvenile court to vacate its order of April 6, 2011, giving the social worker discretion to place the minors in Megan and John's Sacramento home. The stays issued on April 19, 2011, and June 3, 2011, are vacated.

Haller, J., and McIntyre, J., concurred.