Filed 7/29/13  In re Sandra M. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re SANDRA M., a Person Coming Under the Juvenile Court Law. | B246068 (Los Angeles County Super. Ct. No. CK88079) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSEPHINE D., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Melinda A. Green, Deputy County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

The mother, Josephine D., appeals from an October 24, 2012 parental rights termination order. The mother argues she was prejudiced by the juvenile court's decision to proceed with the Welfare and Institutions Code section 366.26 hearing and terminate her parental rights.[1] The mother contends a delay in the section 366.26 hearing was warranted because the department was in the process of placing the child, Sandra M., with a relative. Had the child been placed with a relative, the mother potentially could have retained parental rights under the section 366.26, subdivision (c)(1)(A) exception to adoption. We conclude the mother forfeited the delay issue. We affirm the order terminating the mother's parental rights.

# II. BACKGROUND

## A. Section 300 Petition And Detention

On June 2, 2011, the Los Angeles County Department of Children and Family Services (the department) filed a dependency petition on behalf of the child pursuant to section 300, subdivisions (b) and (g). The petition alleged the mother had mental and emotional problems and a history of substance abuse including alcohol, marijuana and ecstasy, which placed the child at risk of harm. The father, Juan M., was allegedly unable to provide for the child because of his incarceration.

The June 2, 2011 detention report indicated the mother was 16 years old and a juvenile court dependent. The mother had been removed from the maternal grandmother's custody and resided in foster care. On May 27, 2011, the department investigated a referral alleging the mother threw objects and suffered from extreme mood swings and aggressive outbursts within the past several weeks. According to the

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

detention report, "[The mother] has previously locked herself in the room for seven hours with [the child] and would not allow anyone in the room to help her." The mother reportedly had been hospitalized five times in 2009 for her mental health illness. The department recommended detention of the child because of the mother's destructive behavior and mental health problems. The June 1, 2011 last minute information for the court document indicated the department was assessing a paternal great-aunt, Norma M. and her husband, Juan H., for possible placement. The department reported in 2009, Juan H. had two arrests for driving under the influence and two misdemeanor convictions. On June 2, 2011, the child was detained with temporary placement and custody vested with the department.

### B. Jurisdiction/Disposition Report And Hearing

The July 5, 2011 jurisdiction/disposition report indicated the mother had numerous hospitalizations and was diagnosed with mood, bipolar, and post-traumatic stress disorders. In addition, the mother had a history of sexual abuse and exposure to domestic violence. The mother admitted she used marijuana, alcohol and pills--ecstasy and Triple C's--before she was pregnant. The mother denied using narcotics since the child's birth. She agreed to participate in substance abuse counseling and random drug testing.

The department reported the mother, since being released from the hospital, had been visiting the child once weekly. The visits were monitored by an agency social worker. The mother called the child consistently while hospitalized. But the mother did not call as consistently after her release from the hospital.

The department had assessed the paternal great-aunt, Norma, and her husband, Juan H., for placement. But the child could not be placed with Norma. This was because of Norma's husband's prior misdemeanor convictions. Juan H. had two separate 2009 convictions for driving with a suspended license and driving under the influence, which included a refusal to test allegation. The department needed to obtain a criminal history

waiver.  The department asked but had not received documents from Juan H. for submission to the exemption unit.

At the July 7, 2011 jurisdiction hearing, the mother pled no contest to the amended section 300 petition.  The juvenile court accepted the no-contest plea and sustained the following amended count b-1 against the mother:  "[The mother] has mental and emotional problems, which periodically render the mother unable to provide the child with regular care and supervision, when she is not stable on her medication.  Such mental and emotional condition on the part of the mother places the child at risk of harm."  The juvenile court also sustained the following counts b-3 and g-1 against the father, "[The father] is incarcerated and unable to provide the child with the necessities of life, including food, clothing, shelter, and medical care, placing the child at risk of harm."

The mother was ordered to comply with her case plan which included:  random drug testing; parenting classes; transportation assistance; mental health referral; individual counseling and mental health counseling; Wraparound services; and trauma focus therapy.  The mother also was ordered to take all prescribed psychotropic medication.  The mother was granted monitored visits, at least three times or three hours per week, and daily telephone calls with the child and foster mother.

C.  Interim And Status Review Reports and Six-Month Review Hearing

The November 18, 2011 interim review report indicated the mother's visits with the child were inconsistent.  During one visit, the mother became upset about the child's diaper rash and yelled at the foster mother.  Other relatives of the mother's family threatened to have the foster mother reported to unspecified authorities for child abuse and neglect.  The department reported the diaper rash was mild and treated promptly by a doctor.  Because of the incident, the foster mother refused to monitor visits between the child and the mother or any other family members.  The department also reported the mother was not currently enrolled in any counseling and was discovered missing from her group home placement twice.

4

The January 5, 2012 status review report indicated the mother was absent without leave from her various placements seven times from June to November 2011. In November 2011, the mother was placed with the maternal great-grandmother, Blanca D. The mother was not enrolled in any type of counseling because of her frequent placement disruptions. The mother enrolled in parenting skills, alcohol and drug, and anger management classes. But she did not attend classes between October 27 and November 15, 2011. Since then, she had been attending classes more consistently but still had several absences. The mother had two negative drug tests but her December 9, 2011 test was positive for marijuana.

The mother had visited inconsistently with the child. In July 2011, the mother did not see the child for a few weeks. The mother had scabies and she was advised not to visit until she was cleared by her doctors. The mother saw the child once a week after being placed in a group home. The mother left the group home on September 19, 2011. After that, the mother only visited the child four times. Because of the continued placement instability, the mother did not have another monitored visit with the child until November 17, 2011. The department reported that after being placed in the maternal great-grandmother's home, the mother now visited the child weekly.

The department recommended the juvenile court terminate family reunification services because the parents had not fully complied with the court orders. The mother was not medication compliant nor currently participating in individual counseling. The mother had enrolled in parenting, anger management, and alcohol and drug education classes. But she had not attended classes for about three weeks. In addition, the department stated, "[T]he mother continues to show emotional instability as evidenced by her constant replacements and [absent without official leave] incidents."

At the February 10, 2012 contested six-month review hearing, the juvenile court terminated reunification services for the parents. The juvenile court found the mother was not in compliance with the case plan. The juvenile court set a section 366.26 hearing for June 8, 2012 and a review of permanent plan for August 10, 2012.

D. June 8, 2012 Section 366.26 Report And Hearing

The June 8, 2012 section 366.26 report indicated the mother was in partial compliance with the juvenile court orders. The mother was not participating in individual counseling and with her Wraparound team. The mother was not taking any prescribed psychotropic medication. This was because a child psychologist found the mother was not in need of medication. The mother had enrolled in parenting and substance abuse classes at Los Angeles Drug Treatment Center after she was discharged from her prior program. The mother had attended the program regularly but she recently failed to attend the program for almost three weeks. The mother visited the child weekly. The visits were monitored and beginning on May 11, 2012, they were extended from one to two hours.

The social worker reported: the child was a healthy and thriving 14-month old; the child would very likely be adopted if parental rights were terminated; adoptive parents had not yet been identified; and several people had expressed interest in adopting the child. These individuals included: the maternal grandmother and step-grandfather; the maternal great-grandmother; paternal great-aunt, Norma and her husband; the current caregiver, Ana E.; and the current babysitter, Alejandra G.

At the June 8, 2012 hearing, the mother requested the paternal great-aunt, Norma, be evaluated for placement of the child. The juvenile court ordered the department to investigate Norma as a placement option. The section 366.26 hearing was continued to August 10, 2012, to allow the department to continue adoptive planning for the child.

E. August 10, 2012 Status Review Report And Hearing

The August 10, 2012 status review report indicated the department was evaluating different prospective adoptive caretakers for the child. The foster mother's first preference would be for the child to be placed with Norma. The foster mother had regular monitored interactions with the child and the paternal relatives. The foster

mother observed they were loving and appropriate with the child. The foster mother did not want to adopt the child. This was because the foster mother felt the extreme harassment from the mother and other maternal relatives would greatly increase if this option was pursued.

The paternal great-aunt, Norma, and her husband, Juan H., were interested in adopting Sandra. The child was not placed with Norma and her husband but the paternal relatives had regular visits with the youngster. However, the paternal great-aunt indicated her husband was on probation which would preclude him from getting a criminal waiver.

The maternal great-grandmother, the mother's caregiver, also indicated an interest in adopting the child. However, the department did not want to jeopardize the mother's placement with the maternal great-grandmother. This was because the maternal great-grandmother was doing an excellent job of providing stability for the mother. The department ruled out the maternal grandmother as an adoptive caregiver. The maternal grandmother was the subject of a sustained petition regarding the mother. The sustained petition also involved the mother's siblings.

On August 9, 2012, the department filed a last minute information for the court document to clarify the criminal waiver process. The department stated it was possible for Norma's husband to obtain a criminal waiver if he was on unsupervised probation and it had been over a year since his conviction. Until Norma's husband's live scan results were received and assessed, it was unclear whether he was eligible for a waiver exemption.

At the August 10, 2012 hearing, the juvenile court commented the child was "eminently adoptable" and had been with the foster mother "pretty much" since birth. The juvenile court stated: "The Legislature, in its infinite wisdom, has determined that we don't need a preadoptive home or approved home to terminate parental rights of a child who's otherwise adoptable. And it seems to the court, and I expressed this to counsel, the sooner that we resolve these issues with respect to moving forward with the adoption, be that with the current caretaker or any relative who's come forward indicating

their interest, is in the child's best interest because permanence at this point is paramount. And the sooner that we do that, that we get to that point, the best it's going to be for the child. [¶] So even though, generally speaking, I don't usually go forward with 366.26 hearings without an approved adoptive home, that is usually against the law and the code. And in this case I do find it's in the child's best interest to move as expeditiously as possible to the most appropriate permanent plan for the child." The juvenile court set the matter for a contested section 366.26 hearing on October 24, 2012. The mother did not object or ask for a continuance of the October 24, 2012 section 366.26 hearing date.

### F. October 24, 2012 Section 366.26 Report And Hearing

The October 24, 2012 interim review report provided the juvenile court with updated information on the individuals interested in adopting the child. The department reported the paternal great-aunt, Norma, and her husband, Juan H., continued to be interested in adopting the child. The department had gathered all necessary information for the criminal waiver for Juan H. except for the police report and court records of a 1987 incident. Once the department social worker submitted the criminal waiver request, and if one was approved, an assessment of their home would be conducted.

The maternal great-grandmother was interested in adopting the child. But the October 24, 2012 report explained why department staff opposed placement of the child with the maternal great-grandmother: "[The] maternal great-grandmother . . . asked [children's social worker Maria] Gonzalez why she or other maternal family members couldn't be considered for adopting [the child]. [Ms.] Gonzalez explained to [the maternal great-grandmother] that the reason the [d]epartment did not want to place [the child] with her was because it would displace [the mother] and . . . [the department] would risk [the mother] becoming extremely unstable again." In Ms. Gonzalez's opinion, the mother had remained safe and stable while living with the maternal great-grandmother. Under this proposed scenario, the mother would move out because the child would be placed with the maternal great-grandmother. In Ms. Gonzalez's view, this

8

would endanger the mother. The maternal great-grandmother indicated the mother would move out upon reaching the age of 18. Then, according to the maternal great-grandmother, the child could move in. Ms. Gonzalez stated the department would reconsider the question of placement or adoption of the child again once the mother moved out. The maternal great-grandmother identified the maternal great-uncle Juan H. and great-aunt Leslie Y. as prospective adoptive parents. The couple was interested in adopting the child but they could not be live scanned because they only had consulate identification from Guatemala.

The foster mother claimed to love and was bonded with the child. But the foster mother did not want to adopt the child. This was because the foster mother did not want problems with the mother. The foster mother was concerned about her safety and that of the family. In the past, the mother had threatened the foster mother. On one occasion, the mother spoke to the foster mother. The mother claimed to know where the foster mother lives. The mother said the foster mother owned a black car. The foster mother in fact owns a black car and this concerned her.

The department reported the mother continued to have weekly monitored visits with the child. Most visits went well but there were some incidents. During one visit, the mother yelled and cursed at the maternal grandmother in front of the child and others at a fast food restaurant. The mother was on her cell phone during most of the visit. As a result, the maternal grandmother hid the mother's phone. The mother accused the employees of stealing her cell phone, so the maternal grandmother returned it to the mother. The mother began yelling and cursing at the maternal grandmother in front of everyone. During another visit, the foster mother observed the mother appeared to be under the influence of an unknown substance.

At the October 24, 2012 section 366.26 hearing, the juvenile court stated its intention to proceed even though there was not yet an adoptive home for the child. The mother objected to termination of parental rights, arguing the parent-child beneficial relationship exception under section 366.26, subdivision (c)(1)(B)(i) was applicable. The mother contended she consistently visited and acted in a parental role during visitation.

9

The child's counsel and the department argued the juvenile court should terminate parental rights. The child's counsel argued the mother's weekly monitored visits were not indicative of a parental role and no exceptions to adoption had been met by the parents. No continuance motion was made.

The juvenile court found the department had met its burden of proving by clear and convincing evidence that the child was generally and specifically adoptable. The court found the mother had not met her burden of establishing an exception under section 366.26, subdivision (c)(1)(B)(i). The juvenile court found the mother had regularly visited the child but there was nothing in the record indicating a parent-child relationship existed. The juvenile court found it would be detrimental for the child to be returned to the mother and terminated parental rights. The juvenile court ordered the department to continue to assess any and all interested parties, including any and all relatives, as prospective adoptive parents.

## III. DISCUSSION

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Our Supreme Court has summarized the juvenile court's options at section 366.26 hearing: "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).) Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.' (§ 366.26, subd. (c)(1).)" (*In re Celine R., supra,* 31 Cal.4th at p. 53; see *In re Hector A.* (2005) 125 Cal.App.4th 783, 790-791.) One exception to the preference for adoption is set forth in section 366.26, subdivision (c)(1)(A) which permits under specified

circumstances for placement with a relative. (See *Samantha T. v. Superior Court* (2011) 197 Cal.App.4th 94, 113; *In re Lauren R.* (2007) 148 Cal.App.4th 841, 854-855.)

On appeal, the mother does not challenge the juvenile court's adoptability finding. However, the mother argues it was premature for the juvenile court to terminate her parental rights. She contends a delay of the section 366.26 hearing would have allowed the department to place the child with either the paternal great-aunt or the maternal great-grandmother. The mother reasons once the child is placed with either the paternal great-aunt or maternal great-grandmother, that relative could decide to pursue legal guardianship rather than adoption. The mother then would have been able to preserve her parental rights by asserting the relative caregiver exception existed under section 366.26, subdivision (c)(1)(A).

This issue has been forfeited. The mother did not object or ask for a continuance when the juvenile court set the contested section 366.26 hearing at the August 10, 2012 hearing. In addition, the mother did not object or seek a continuance at the section 366.26 hearing on October 24, 2012. Generally, an appellate court will not consider a challenge to a ruling if an objection is not made in the juvenile court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re A.E.* (2008) 168 Cal.App.4th 1, 5.) Here the mother's arguments are premised on the unsupported assumption a delay would have resulted in a finding the section 366.26, subdivision (c)(1)(A) exception applied. As no effort was made to delay the section 366.26 hearing, the issue raised on appeal has been forfeited.

## IV.  DISPOSITION

The October 24, 2012 order terminating the parental rights is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

KRIEGLER, J.