Filed 3/24/14  In re Georgia E. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re GEORGIA E., a Person Coming Under the Juvenile Court Law. | B250538 (Los Angeles County Super. Ct. No. CK64159) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.E., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert S. Draper, Judge.  Affirmed.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

A. E. (Mother) challenges juvenile court orders (1) summarily denying her petition for a modification and (2) finding that the child is likely to be adopted. We find no error and affirm the order terminating parental rights.

## FACTS

Mother gave birth to Georgia E. in June 2006, telling hospital staff that she was homeless and had not prepared for the birth by obtaining clothing, diapers or a car seat. The hospital notified the Department of Children and Family Services (DCFS) that Mother appeared to be unable to care for a newborn. After interviewing Mother, the social worker collected Georgia from the hospital and placed her in foster care. DCFS filed a petition on behalf of the child. Mother denied the allegations. The juvenile court found a prima facie case for detaining Georgia. Mother was given monitored visits.

Mother was involuntarily hospitalized in July 2006 because she heard voices telling her to kill herself, was acutely psychotic, paranoid and hallucinating. She was diagnosed with paranoid schizophrenia. Her condition improved with medication and she left the facility after one week.

On August 23, 2006, the court sustained allegations that Georgia is at risk of serious harm because Mother is unable to make a plan for the child's care or provide the necessities of life, and Mother's schizophrenia limits her ability to care for the child. The court ordered DCFS to provide family reunification services. Mother was given monitored visits.

As 2007 began, Georgia was placed in the home of maternal great grandmother Emma S. Mother lived in Bakersfield and seldom visited Georgia in Los Angeles. She enrolled in parent education, but provided no information about participating in counseling. Mother felt she needed two years "to get herself together" to reunite with Georgia. In February 2007, the court terminated Mother's reunification services because there was no substantial probability of reunification in the foreseeable future. DCFS was ordered to provide permanent placement services to Georgia in the home of Emma S.

Emma S. provided a suitable home for Georgia and a seven-year-old relative named Matthew. At a permanent plan hearing on June 20, 2007, Emma S. was appointed

2

as the legal guardian of one-year-old Georgia. During 2007-2008, Georgia continued to live comfortably under the guardianship of Emma S. Mother visited sporadically, once or twice per month. The court terminated jurisdiction on March 5, 2008.

In January 2009, in the presence of Georgia and eight-year-old Matthew, Emma S. was stabbed to death by an adult grandson, creating a horrific bloody scene. The killer commanded Matthew to light Emma S. on fire, and threatened to kill Georgia if Matthew did not comply. Matthew sustained a defensive knife wound while protecting Georgia. Emma S. was found dead inside the burning home by law enforcement. A traumatized Georgia was detained by DCFS.

DCFS filed a new petition on behalf of Georgia, alleging that the child has no guardian to provide ongoing care and supervision. The court found a prima facie case for detaining Georgia. Mother filed a petition for modification seeking custody of Georgia on the grounds that she has completed parent education, anger management and counseling, plus she has housing. The court denied the petition because it did not serve the best interests of the child. Georgia remained secreted by DCFS because the murder suspect was at large, placing the two young eyewitnesses to the crime at grave risk. Mother's anger management counselor could not recommend that Mother take custody of Georgia because Mother needs "full time supervision." Mother was on probation for a 2008 criminal assault on a restaurant patron.

Mother's visits were suspended until the murder suspect—her brother—was apprehended. After his arrest, Mother interfered with her brother's criminal proceeding and demanded his release: the district attorney opined that Mother could pose a risk to Georgia because Mother was agitated and seemed mentally ill and possibly violent, so she should not be told the whereabouts of the two child eyewitnesses to the murder. The juvenile court found, in March 2009, that it would be detrimental for Georgia to see Mother. The proposed permanent plan for Georgia was adoption, and DCFS began searching for prospective adoptive families.

Mother renewed her request for custody in July 2009, stating "God knows why" the change would best serve the child's interest. Though the court authorized Mother to

have monitored visits in June 2009, Mother had not visited Georgia at all by the end of August 2009. Georgia and Matthew, who had been raised as "siblings," were in a foster placement together: the caregiver was willing to care for them as long as necessary but was not interested in adoption. The court denied a modification on September 4. Days later, Mother filed another petition seeking custody, or to have Georgia adopted by Mother's aunt. Her request was denied on October 30, 2009.

DCFS placed Georgia and Matthew with Mary H., a maternal aunt, in January 2010, despite her fears of retaliation from Mother. Georgia was diagnosed with speech and motor delays and was receiving special services. Mother visited Georgia once in December 2009; she also telephones Georgia, but says inappropriate things, e.g., the monitor reported that Mother told her three-year-old that she was about to slap someone on the bus and go to jail. By April 2010, the maternal aunt said she was "overwhelmed" and having difficulty with the children's behavior. Therapy and assistance were provided, and the placement continued. Mother visited Georgia once, in July 2010, with a monitor. Troubles persisted in the children's placement, delaying completion of an adoption home study.

In October 2010, DCFS detained Georgia and placed her in foster care after Mary H. asked for the children to be removed. Matthew had physically assaulted her and Georgia had severe temper tantrums, grunted, refused to look or speak to people, bangs her head all night long, cries for no reason, and cried when the caretaker set limits. Georgia misperceived hot sauce as "blood" and walks around home and school with a look of fear and horror. Georgia was distressed by the move and asked for "Auntie Mary." Mother requested custody of Georgia. The court ordered speech therapy and counseling for Georgia, and allowed Mother to have one-hour monitored visits. Georgia continued to display tantrums and had difficulties in her foster placement, showing loving behavior one moment and anger the next.

By February 2011, Mother had visited Georgia once in four months. Between February and August 2011, Mother visited Georgia once, at the DCFS office. The monitor observed that Georgia did not know who Mother and the maternal grandmother

4

were:  Georgia resisted when Mother tried to pick her up.  Mother has weekly monitored telephone contact, but has little to say and Georgia does not know to whom she is speaking.  DCFS continued to search for an adoptive home open to children with mental illness backgrounds.  Georgia was progressing well since October 2010 with her foster caregiver, who did not wish to adopt or become a legal guardian.

Mother requested a modification in December 2011, asking for reunification services and custody of Georgia.  Alternatively, Mother sought unmonitored visitation and weekend visits.  The grounds were that Mother recently completed a parenting class, was participating in individual counseling, and was taking prescribed medication for schizoaffective disorder, bipolar type.  Mother has an apartment.  She described pleasant visits with Georgia.  Mother's psychiatrist stated that Mother recently became more open to treatment—after previously resisting treatment—yet "still questions the validity of her diagnosis and denies her own need for mental health services."  A maternal relative and his wife expressed interest in Georgia, but did not visit the child or call the social worker.

Mother had monitored visits with Georgia once in August, once in November and once in December 2011.  In a February 2012 report, the social worker described "minimal interaction" between Georgia and Mother:  during visits, Georgia becomes anxious and glues herself to the foster caregiver.  When Mother told Georgia that "you're my baby," not the foster mother's baby, "Georgia did not comprehend anything that [M]other was telling Georgia."  During monitored telephone calls, Georgia has difficulty knowing who she is speaking to and is upset when Mother says that the caregiver is not her mother because Georgia refers to the caregiver as mother.  Mother inappropriately tells Georgia to read and do math, but Georgia is five years old and not literate.  Mother's calls cause Georgia to become anxious, confused, frustrated and have tantrums.  Since October 2010, Georgia has lived with a foster mother who provides appropriate mental, dental, and educational care and parental support.

DCFS opposed Mother's requests for custody and unmonitored visits.  Despite completing parent education, Mother did not demonstrate good parenting skills when she visited or telephoned Georgia.  Further, Mother resisted mental health treatment for

5

years, and only recently started to attend appointments with any regularity. She denies any need for mental health services. During a visit to Mother's home, the social worker smelled marijuana, but Mother denied that she or anyone else used the drug in her home.

DCFS reviewed 30 families that expressed interest in adopting Georgia. In March 2012, Georgia's former caretaker, maternal aunt Mary H., expressed renewed interest in Georgia, though not in Matthew; her request was denied because DCFS decided that it would be detrimental to separate the two children. In July 2012, Georgia was removed from her foster home after sexually touching and physically battering the caregiver's two-year-old biological daughter. Mother had monitored visits with Georgia once in February, once in April, and once in June 2012. (A visit at the end of July 2012 did not take place because Mother arrived too late.) Mother acted strangely during the visits, gave Georgia $20, then took the money away from the child, accused the caregiver of not feeding Georgia, and became loud and aggressive during a visit, accusing everyone of lying; the maternal grandmother told the social worker that Mother "is crazy." Georgia eats to the point of vomiting, bangs her head at night, requires constant attention, and uses medication for schizophrenia and bipolar disorder.

DCFS located an out-of-state prospective adoptive family for Georgia and Matthew. The family visited the children four days in November and three days in December 2012. Georgia expressed a desire to be adopted by the family. Mother visited Georgia once, in October 2012, and the five-year-old child did not appear to comprehend what Mother was saying about graduating from high school. Mother next visited the child in March 2013. The family from Florida stayed in contact with Georgia and Matthew and wanted to proceed with the adoption. Georgia looks forward to their telephone calls and scolds them if they are late in calling.

Mother petitioned for a modification on May 17, 2013. She asked the court to "let my daughter come home and visit with me" on the grounds that Mother has enrolled in a different mental health program. The request was denied for lack of new evidence or a change in circumstances. Mother filed another petition on June 28, 2013, stating that her cousin Q. E. wanted custody of Georgia. Q. E. confirmed that she wished to adopt

6

Georgia, though she has not had any contact with the child. By contrast, the prospective adoptive family had an approved home study. The court denied the petition for lack of new evidence or a change in circumstances. The court terminated Mother's parental rights on July 11, 2013, and found by clear and convincing evidence that Georgia is adoptable and likely to be adopted. Mother appealed from the termination of her parental rights.

## DISCUSSION

### 1. Petition for Modification[1]

A parent may seek a modification by demonstrating that a change in the court's orders is in the child's best interests, due to changed circumstances. (Welf. & Inst. Code, § 388; *Kimberly H. v. Superior Court* (2000) 83 Cal.App.4th 67, 72; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)[2] The court need not conduct a hearing if the liberally construed allegations of the parental petition for a modification do not show a genuine change in circumstances such that the child's best interests will be promoted by the proposed change in order. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1071.) To make this determination, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258; *In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) On appeal, we will not reverse unless there is a clear abuse of discretion, if the court made an arbitrary, capricious or patently absurd determination that exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

Mother contends that the juvenile court should have granted her petition to place Georgia with maternal cousin Q. E. because there is a legislative preference for placement with relatives. Once the juvenile court is presented with a proposed permanent

---

[1]     Mother's notice of appeal does not reference the petition for modification.

[2]     All unlabeled statutory references are to the Welfare and Institutions Code.

plan for adoption that involves a new placement, consideration must be given "to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements." (§ 361.3, subd. (d).) This involves several factors, including "whether the relative has established and maintained a relationship with the child." (*Ibid.*) Access to relatives is one factor a court considers in making a permanent placement decision; the overriding concern, however, "is not the interest of extended family members but the interest of the child." (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032; *Samantha T. v. Superior Court* (2011) 197 Cal.App.4th 94, 113.)

Q. E. has never met Georgia: she did not contact DCFS, did not seek custody, and did not visit even once during the child's seven years in the dependency system, from June 2006 to July 2013. Thus, the statute favoring relatives who have established and maintained a relationship with the child is unmet. (§ 361.3, subd. (d).) Q. E. appeared from nowhere at the eleventh hour, and there is no indication that she is capable of meeting Georgia's needs.

By contrast, the prospective adoptive family cultivated a relationship with Georgia over half a year, traveled from Florida to spend time with her, telephoned regularly, and Georgia expressed a desire to be adopted by the family. The family had an approved adoptive home study. The family is aware of Georgia's needs and was working with an adoptive agency social worker to arrange therapeutic and medical services for her. They enrolled in and were completing classes to address Georgia's needs.

Critically, Q. E. did not tell DCFS that she is willing to adopt Matthew. Georgia and Matthew were raised as siblings, had undergone a trauma while witnessing the murder of their guardian Emma S., and had been in multiple placements together. They did not want to be separated. The prospective adoptive family was willing to adopt both Georgia and Matthew, and not break the bond between them.

Although Q. E. is a relative, there is no evidence supporting a preference for her. Q. E. is a complete stranger to Georgia. What is more, Georgia expressed uncertainty about the identity of Mother and the maternal grandmother. The benefit to Georgia of

future family contact owing to placement with unknown relative Q. E. is more tenuous than placement with the prospective adoptive family. At this stage of the proceeding, the best interest of Georgia is to be with Matthew and an adoptive family who can handle her needs. Q. E.'s status as a maternal relative merits minimal consideration as she never contacted DCFS; rather, Mother proposed Q.E. after Georgia expressed an interest in going to Florida to be adopted.

Though Mother has concerns about the success of the proposed adoption, the court retains jurisdiction over the child and reviews the case every six months to ensure that the adoption is completed as expeditiously as possible. (§ 366.3, subd. (a).) The court must determine the continuing appropriateness of the placement, if the adoption has not been completed within one year. (§ 366.3, subd. (d).)

Liberally construed, Mother's petition for a modification does not show a need for a full hearing to determine whether Georgia's best interests would be served by a change in order. Georgia's first relative placement failed because her guardian was murdered. The second relative placement failed when the maternal great aunt, a prospective adoptive parent, asked DCFS to remove Georgia and Matthew from her home. Q. E. is the third maternal relative seeking custody, but she made no effort to comfort or develop a relationship with Georgia at any point in this child's difficult life. Many years have passed without stability or a permanent home for Georgia. Q. E.'s last-minute appearance—at Mother's urging—is an effort to sabotage the possibility of a permanent home for Georgia, and the juvenile court properly rejected this effort.

## 2. **Evidence that Georgia Likely to Be Adopted**

If the juvenile court determines that the child is likely to be adopted, the court must terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (c)(1).) On appeal, Mother has the burden of showing that the finding of adoptability is not supported by substantial evidence. (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.) We review the finding without assessing the credibility of witnesses, and without resolving conflicts in or weighing the evidence. (*Ibid.*)

9

Mother contends that Georgia is not likely to be adopted. "To be considered adoptable, a minor need not be in a prospective adoptive home and there need not be a prospective adoptive parent '"waiting in the wings."' [Citation.] Nevertheless, 'the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.'" (*In re R.C.*, *supra*, 169 Cal.App.4th at p. 491; *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650; *In re Marina S.* (2005) 132 Cal.App.4th 158, 165.) In this case, a prospective adoptive couple in Florida is committed to adopting Georgia, indicating that she is likely to be adopted within a reasonable time.

Mother argues that the prospective adoptive family in Florida must be willing and able to follow through with the adoption. The court generally may not inquire into a family's suitability, because the hearing would degenerate into an attack by the natural parents on the prospective adoptive family, to avoid termination of parental rights. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) The inquiry is limited to whether there is a *legal* impediment to adoption, i.e., the prospective adoptive parent is less than 10 years older than the minor, or the consent of a child over age 12 is lacking, or the spouse of the adoptive parent refuses to consent. (*Ibid.*; *In re Scott M.* (1993) 13 Cal.App.4th 839, 844.)

There is no legal impediment to this adoption. The record shows that the prospective adoptive family is licensed for adoption and has an approved adoptive home study. The adoptive family visited Georgia and Matthew November 20-23, 2012, December 25-27, 2012, and March 28-April 1, 2013, including an overnight visit.[3] They consistently maintained telephone contact with Georgia and Matthew between visits.

---

[3] During this time period, Mother visited Georgia once in October 2012 and did not see her child again until March 2013.

10

During a private interview with the DCFS social worker, Georgia stated "that she would like to be adopted" by the prospective adoptive family. The couple has been married for over seven years, are employed, have clean backgrounds, and have a closely knit extended family. They are arranging therapeutic, medical and school services for Georgia and Matthew to ensure success. The family "is fully committed to provide them with a permanent and stable home environment."

After spending 11 days with Georgia, and after many telephone calls, the prospective adoptive parents remain committed to adoption. Though Mother underscores Georgia's behavioral issues, the adoptive family was made aware of her behavior and arranged psychiatric services to address any problems. "The possibility [the child] may have future problems does not preclude a finding [s]he is likely to be adopted." (*In re R.C.*, *supra*, 169 Cal.App.4th at p. 492.) The juvenile court could reasonably believe that Georgia's attention-seeking behavior stems from the trauma of witnessing her great grandmother's stabbing death and immolation, and from the instability of having multiple caretakers. The child is otherwise in good health.

Despite Mother's effort to paint Georgia as a hopeless case, the prospective adoptive family feels otherwise. There is no purpose in preserving Mother's parental rights, when she seldom visits Georgia and the child does not recognize her as a parent. In fact, Georgia barely knows Mother. Freeing Georgia for adoption best furthers her right to a stable, permanent home with caretakers who are making a full emotional commitment to the child. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) "At this stage of the proceedings, if an appropriate adoptive family is or likely will be available, the Legislature has made adoption the preferred choice." (*In re Celine R.* (2003) 31 Cal.4th 45, 49.) Ample evidence supports the juvenile court's finding that Georgia is likely to be adopted.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

BOREN, P.J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.

12