Filed 1/15/15  In re O.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re O.A., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059174 / E060958 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J245995 & CK 59898) |
| v. | OPINION |
| A.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Jeffrey L. Bryson and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

# I

## INTRODUCTION

In this consolidated appeal, appellant April A. (mother) appeals three orders: (1) jurisdiction and disposition orders on June 11, 2013, made regarding mother's daughter, O.A., born in 2000; (2) an order on October 15, 2013, partially denying mother's modification petition; and (3) a permanent placement review (PPR) order on February 28, 2014. Mother and O.A.'s father[1] have been incarcerated since O.A. was four years old. O.A. has never had any visitation with mother.

In mother's first appeal, mother contends there was insufficient evidence to support the juvenile court's order authorizing administration of psychotropic medication to O.A. Mother also argues the juvenile court erred in denying her in-prison visitation. In mother's second appeal, mother contends the juvenile court erred in partially denying her modification petition and denying her request that her friend, F.S., be assessed for placement. In mother's third appeal, mother argues the juvenile court erred in denying conjoint therapy; denying visitation and contact with O.A. unless O.A. requests it; authorizing psychotropic drugs for O.A.; and finding there was not a qualified guardian available for O.A. We conclude the juvenile court did not commit reversible error and affirm the judgment.

---

[1] Father is not a party to this appeal.

II

FACTS AND PROCEDURAL BACKGROUND

The juvenile proceedings in this matter began in the Los Angeles County Superior Court, resulting in numerous appeals, including three heard in the Second District Court of Appeal, Division Three (case Nos. B189905, B202585, and B215026), in 2006, 2008, and 2009.[2]  The first and second Court of Appeal decisions contain detailed summaries of the facts and proceedings through September 18, 2007.  Those facts are only briefly summarized in the following summary of facts and proceedings in this case.

**First Appeal (June 11, 2013 Order)**

*Parents' Incarceration and Placement of O.A. and E.A. with Relatives*

Prior to mother's incarceration in January 2005, mother worked as a licensed vocational nurse for 10 years.  Mother gave birth to O.A., mother's first child, in 2000. In November 2004, father went on a shooting spree, with mother and O.A. in the car.  No one was physically injured.  Father claimed mother did not know he was carrying a pistol.  Mother and father were convicted of attempted murder.  Father was incarcerated

---

[2]  In mother's first and second appeals (case Nos. B189905 and B202585), mother challenged the disposition order and an order terminating parental rights to O.A.'s sister, E.A., on the grounds of noncompliance with Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and issues of placement of O.A. and E.A.  The Court of Appeal affirmed the orders, with directions the juvenile court order the Los Angeles Department of Children and Family Services (LACFS) to comply with ICWA notice provisions.  (*In re E.A. and O.A.,* 2006 Cal.App.Unpub. LEXIS 10240, pp. 2, 23; *In re O.A.,* 2009 Cal.App.Unpub. LEXIS 7614, pp. 1, 6.)  Mother's third appeal (case No. B215026) concerned only E.A. and resulted in the Court of Appeal affirming the lower court order terminating parental rights as to E.A.  (*In re E.A.,* 2009 Cal.App.Unpub. LEXIS 7614, pp. 2-3, 27.)

in November 2004, on a 30-year sentence, with a release date of 2035.  Mother was incarcerated in January 2005, on a 13-year sentence, with a release date of 2016.  Mother's brother and his wife (Aunt and Uncle) initially cared for O.A. during mother's incarceration.  While incarcerated, mother gave birth to a second daughter, E.A., born in June 2005.  Mother arranged for E.A.'s maternal great-uncle (Great Uncle) to care for E.A.[3]

*Juvenile Dependency Petition*

On July 7, 2005, Los Angeles Department of Children and Family Services (LACFS) received a referral alleging that E.A., who was one month old, was being sexually abused (fondled) by Great Uncle.  Although the LACFS and law enforcement concluded there was insufficient evidence Great Uncle sexually abused E.A., there was evidence Great Uncle had drugs in his home, abused drugs and alcohol, and was careless in caring for E.A.  LACFS therefore concluded mother had placed E.A. in an unsafe environment with Great Uncle, removed E.A. from Great Uncle's care, and placed E.A. in a foster home.  O.A. and E.A. were not placed together.  O.A.'s therapist recommended against placing the siblings together because of O.A.'s aggressiveness.  During LACFS's investigation of the matter involving E.A., LACFS discovered that mother was incarcerated and O.A. was living with Aunt and Uncle.  LACFS found that Aunt and Uncle were appropriately caring for O.A.

---

[3] The LACFS juvenile dependency petition and status review reports initially state that E.A.'s caretaker was O.A. and E.A.'s maternal great-uncle.  Later reports state that he is a maternal cousin.

LACFS filed a juvenile dependency petition under Welfare and Institutions Code sections (a), (b), (d), (i), and (j),[4] as to both E.A. and O.A. (the girls) on July 13, 2005. The petition alleged the girls' parents had a history of violent behavior and were incarcerated for participating in a freeway shooting in November 2004; mother placed E.A. with Great Uncle, an inappropriate caretaker who, on July 7, 2005, sexually abused E.A. and had illicit drugs in his home, and whom mother knew abused drugs and alcohol.

The juvenile court ordered E.A. detained in foster care and O.A. detained in her current placement with Aunt and Uncle. E.A. was not placed with Aunt and Uncle because they felt they would not be able to care for her adequately, since she was an infant and they lacked funding. Uncle and Aunt lived in a small home and were already caring for their own child and O.A.

In 2005, O.A. screamed when she saw mother in court. In July 2006, O.A.'s therapist diagnosed O.A. as suffering from adjustment disorder with anxiety, posttraumatic stress disorder, sexual and physical abuse, and prolonged child neglect and endangerment by her parents. In response to mother's request to see O.A. at the courthouse on July 25, 2006, O.A.'s therapist recommended that O.A. not see mother due to O.A.'s diagnosis and O.A. recently experiencing an increase in "scary" feelings from changes in her life, including entering first grade and being away from home longer.

---

[4] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

O.A.'s therapist concluded that O.A. seeing mother could trigger more intense feelings of distress.

*Jurisdiction and Disposition Hearing*

In August 2005, Uncle told the LACFS social worker that, because O.A. had been through a lot of trauma while living with mother, O.A. was afraid to be alone, scared of the dark, had nightmares, and sexually acted out with Uncle's 18-month-old son. O.A. told Aunt and Uncle that mother had left her alone for long periods of time and moved O.A. from house to house, requiring O.A. to change schools frequently. Uncle noted O.A. had been in the back seat of the car during the shooting incidents. Aunt was seeking counseling for O.A. Although O.A. was making progress, Uncle was very concerned for O.A.'s emotional stability and wanted the court to take jurisdiction over O.A., because he did not want mother taking O.A. away and again exposing O.A. to such devastating conditions, after all of Aunt and Uncle's efforts to stabilize O.A. In June 2005, O.A. began seeing a therapist. In December 2005, the juvenile court ordered respite care for O.A. The court ordered O.A. removed from Aunt and Uncle's home because they felt they no longer could care for her due to O.A.'s behavioral problems and financial costs. In February 2006, after six weeks of respite care, O.A. returned to Aunt and Uncle's home.

At the jurisdiction hearing on February 7, 2006, the juvenile court sustained the allegations in the juvenile dependency petition under section 300, subdivisions (b) and (j), declared O.A. and E.A. dependents of the juvenile court, ordered O.A. and E.A. removed from parents' custody, denied reunification services, and set the matter for a

6

section 366.26 hearing. On July 24, 2007, the juvenile court found O.A. not adoptable because she was living with relatives who did not wish to adopt her but were willing to be her legal guardians. The court accordingly appointed Aunt and Uncle as O.A.'s guardians.

*Interim Review Hearings*

At an interim status review hearing on February 25, 2008, O.A.'s attorney informed the court that Aunt and Uncle were struggling with O.A.'s care in part because mother was continually harassing them and questioning their care of O.A. The court ordered that all letters between mother and O.A. were to go to the social worker and then forwarded if appropriate. The court further authorized mother to have one weekly, monitored phone call to O.A. LACFS reported in its March and September 2009, and March 2010 status review reports that O.A. was doing well in Aunt and Uncle's home and at school. O.A. was emotionally stable, with no behavioral problems. O.A. spoke to mother by telephone on Sundays. O.A. was in therapy.

At the September 2010 review hearing, O.A.'s attorney told the juvenile court that Aunt and Uncle were struggling financially because Aunt had been laid off and had medical issues that prevented her from caring for O.A. Counsel also noted that O.A. suffered from a lot of anxiety, including being afraid at night and when left alone, day or night. O.A. had been seeing a therapist pro bono for a couple of years. Mother requested visitation with O.A. at the prison and noted that mother was supposed to be able to call O.A. but that was not happening. The court set a hearing regarding visitation, phone calls, and letters.

7

LACFS reported in its October 2010 interim review report that Aunt did not think it would be appropriate for O.A. to visit mother in prison. The social worker stated she did not approve of O.A. visiting mother in prison but did not object to mother talking to O.A. on the phone. However, O.A. said she did not like talking to mother on the phone. The juvenile court ordered continuation of the existing orders regarding visitation, monitored telephone calls once a week, and correspondence between mother and O.A. to be provided through LACFS.

LACFS reported in March 2011, that O.A. was emotionally stable and continued to do well in school and in her home placement. She qualified for the Gifted and Talented Education Program (GATE) and had received school awards. Mother continued to request O.A. visit her in prison, even after the social worker advised her several times that it would not be in O.A.'s best interest. Aunt and Uncle agreed there should be no visitation at the prison. O.A.'s therapist had also stated such visitation was not advisable. At the review hearing on March 9, 2011, the juvenile court denied mother's visitation request, stating that the court was concerned about the welfare of O.A. and, until there was a change of circumstances, visitation would be denied.

In July 2011, the juvenile court ordered E.A. adopted and terminated jurisdiction over E.A.

LACFS reported in its December 2011 interim review report that O.A. was experiencing serious mental health issues. O.A. was diagnosed with psychosis and prescribed Risperdal on March 1, 2012.

8

LACFS submitted a request to the juvenile court on March 7, 2012, for administration of Risperdal. At the hearing on March 7, 2012, mother again requested visitation, which was denied. The court approved the case plan, which included providing O.A. with counseling, a psychotropic medication evaluation, and monitoring. O.A. continued to do well in school despite suffering frequent anxiety attacks throughout the day, paranoia, and hallucinations. Since O.A. began taking Risperdal, O.A. was able to sleep in her bed but continued to fear someone was trying to kill her during the night.

LACFS reported in September 2012, that O.A. continued to have anxiety attacks and hallucinations but they were less frequent since she had started taking medication. At the review hearing on September 5, 2012, mother's attorney stated that mother's weekly calls had stopped in February 2012 because O.A.'s legal guardians could no longer afford to receive mother's collect calls. Mother therefore requested funding for the calls. Mother also requested in-prison visits. Mother's attorney did not object to the current case plan, which included providing O.A. with psychotropic medication and counseling. O.A.'s attorney informed the court that O.A. was finally able to sleep in her bed, not under it, but O.A. still had nightmares, hallucinations, and frequent anxiety attacks during the day.

The juvenile court ordered contact between mother and O.A. limited to letters through the social worker and all current orders remain in effect. The court also ordered the case transferred from the Los Angeles County Superior Court to San Bernardino County Superior Court, the county where O.A. and mother were located.

*Juvenile Dependency Case Proceedings in San Bernardino County*

San Bernardino County, Department of Children and Family Services (CFS) reported in its November 2012 hearing report that a social worker visited O.A. and provided a referral of O.A. to the San Bernardino County Juvenile Court Behavioral Health Services Department (DBH) for psychiatric medication. During the social worker's initial visit, O.A. said she disliked sharing a room with her nine-year-old male cousin because he was very messy and wanted to be moved. O.A. also said her aunt was sometimes mean, but O.A. did not elaborate. O.A. appeared to be well cared for. Aunt reportedly was limiting mother's phone calls to O.A. to holidays. Uncle had not been living in the family home since July 2011 because he was employed out of state.

O.A.'s therapist, Joyce Noblitt Herold, reported on September 27, 2012, that O.A. did not wish to have any type of visitation with either of her parents. Herold concluded O.A. "would be put at risk for more psychotic episodes if she were to be made to have visits with her mother in prison at this time. . . . I believe that [O.A.] is mentally and emotionally raw and fragile at this time, and therefore should not be put in the uncompromising position of having to choose her mother's (or father's) needs over her own . . . i.e. that of visitation when [O.A.] is clearly not ready for such an ordeal."

CFS reported in February 2013, that O.A. continued to do well in school. Aunt did not want to adopt O.A. since O.A. was college bound and Aunt wanted O.A. to qualify for benefits and services, and remain under the supervision of the court. Uncle continued to reside out of state for employment reasons. At the postpermanency review hearing on March 6, 2013, the court once again denied mother's request for in-prison

10

visitation and ordered CFS to ask O.A. if she wanted phone contact with mother. If so, CFS was authorized to permit monitored phone contact.

*Termination of Legal Guardianship*

On March 7, 2013, O.A. was hospitalized on an involuntary psychiatric hold under section 5150. O.A. was released on March 14, but the next day placed back on a section 5150 hold because her thoughts of harm recurred. On March 26, 2013, during a family meeting at Loma Linda Behavioral Medical Center (LLBMC), O.A. said, "[I]f she returned to [Aunt's] home, she would burn down the house with [Aunt] inside." Aunt did not feel safe but did not want O.A. to get lost in the system. Therefore Aunt did not want to relinquish legal guardianship and wanted O.A. to return home after she received mental health services addressing O.A.'s suicidal and homicidal thoughts. CFS concluded O.A. required a level of care beyond that which Aunt could provide. On March 28, 2013, O.A. began taking Zoloft, in addition to taking Risperdal. O.A. was discharged from LLBMC and placed in a new foster home. O.A. said she was glad to leave LLBMC and not return to Aunt's home.

*Supplemental Juvenile Dependency Petition*

On April 2, 2013, CFS filed a section 387 supplemental petition, alleging that O.A.'s behavior was beyond Aunt's ability to care for her. At the detention hearing on April 3, 2013, the juvenile court found that O.A.'s placement with Aunt was no longer effective or appropriate and O.A. was ordered placed in foster care. On April 19, 2013, O.A. reported that another female foster child in her foster home had "molested" and "inappropriately touched" her. O.A. was moved that same day to the foster home of

11

A.S., who only spoke Spanish and had two biological children and one six-year-old foster child. O.A. said she liked her new placement.

*Jurisdiction/Disposition Hearing on Supplemental Petition*

In the May 7, 2013 jurisdiction/disposition report, CFS recommended legal guardianship be terminated and O.A.'s permanent plan changed to a Planned Permanent Living Arrangement (PPLA). The social worker reported that, when the social worker told O.A. she could write to mother and her letter would be mailed to mother, O.A. "shrugged it off" and said she did not like to write. O.A. had not visited with mother since mother was incarcerated in 2005.

At the review hearing on May 7, 2013, mother's attorney objected to O.A. taking psychotropic medication. Mother believed O.A.'s behavioral issues were attributable to something occurring while O.A. was living with Aunt or because phone calls between mother and O.A. suddenly stopped in February 2012. Mother requested face-to-face visits with O.A. at the prison and phone calls. O.A.'s attorney objected to face-to-face visitation. The court denied face-to-face visitation in prison on the ground it was not in O.A.'s best interest, and granted CFS's request to have A.S. assessed for placement.

On June 7, 2013, CFS filed a report stating that O.A. had said she did not want to visit mother in prison. When asked on May 30, 2013, if O.A. wanted to see mother in prison, O.A. said, "I think that would be scary and I don't want to do that." CFS reported that O.A. was healthy and happy in her current placement with A.S., and wanted to remain there. CFS recommended terminating O.A.'s legal guardianship with Aunt and Uncle.

12

On June 11, 2013, at the jurisdiction/disposition hearing on the section 387 supplemental petition, the court found true the allegations in the petition, ordered jurisdiction over O.A., and ordered O.A. removed from her legal guardians, Aunt and Uncle. O.A.'s permanent plan became a PPLA in which O.A. was to remain with her current caretaker, A.S. The court rejected mother's request for in-prison visitation but authorized letters and phone calls if O.A. requested them. The court denied mother's request F.S. be assessed for a concurrent planning home.

On July 11, 2013, mother filed a notice of appeal of the June 11, 2013 order.

**Second Appeal (October 15, 2013 Order)**

*Section 388 Petition*

On August 13, 2013, mother filed a section 388 petition, seeking reunification after she completed her prison sentence, in-prison visitation, cessation of O.A. taking psychotropic medication, permanent placement of O.A. with F.S., sibling visitation with E.A., transportation of mother to and from court hearings, and transfer of the case back to Los Angeles. Mother acknowledged O.A. had mental health problems but believed they should be addressed by changing O.A.'s therapy and therapist. O.A. alleged that O.A.'s legal guardians had brainwashed O.A. into opposing visitation with mother, and Aunt was deceitful, manipulative, and lied.

CFS reported in its August 2013 review reports that O.A. was doing well in her foster home, was happy there, did not want to move, and had bonded with A.S. and her family. O.A. continued to do well in school. O.A. declined CFS's offer to arrange for a

13

conference call with mother in prison. CFS recommended O.A. continue her psychotropic medication. The court continued all prior orders.

CFS reported in its response to mother's section 388 petition that O.A. said she did not want to live with F.S. and did not want to visit mother in prison. The social worker concluded O.A. was not ready to interact with mother, including talking to her. The social worker believed such contact might open emotional wounds, which O.A. was not equipped or ready to handle. CFS recommended O.A. remain in her current foster home.

On October 15, 2013, at the hearing on mother's section 388 petition, the court denied all requested relief, with the exception the court ordered that mother's letters and phone calls to O.A. were to be supervised and scheduled by the social worker.

In November 2013, Mother filed a notice of appeal challenging the October 15, 2013 order.

**Third Appeal (February 28, 2014 Order)**

During a nonappearance review update on January 24, 2014, the juvenile court stated that O.A. was happy, pleasant and easy going in her foster home. At times she is restless and easily bored. O.A. denied having thoughts of harming others or having any hallucinations. O.A. reported she felt safe in her current placement. Dr. Cho reported that on January 24, 2014, O.A. was taking Risperdal (0.5 mg) and Zoloft (100 mg). Dr. Cho would continue to monitor O.A. monthly, with the goal of continuing Zoloft and discontinuing Risperdal.

The juvenile court further reported in its January 24, 2014 review report that O.A. had received individual therapy from Center for Healing Childhood Trauma. O.A.'s

14

therapist recommended O.A. continue therapy to address feelings about mother and abandonment. O.A. did not want to participate in therapy. O.A. would continue to be monitored by CFS, the foster care agency, and the Department of Behavioral Health (DBH). All prior orders were ordered in full force and effect.

On February 7, 2014, and again on February 11, 2014, mother filed numerous documents with the court, including (1) a request for a telephone court appearance because she was incarcerated and (2) a supporting declaration stating mother spoke to O.A. by phone on December 16, 2013, and requesting: (a) O.A. visit mother in prison by participating in the "Get on the Bus" event on Mother's Day, (b) the court order O.A. have a mentor and court-appointed special advocate (CASA), (c) copies of O.A.'s progress/report cards, (d) bimonthly phone calls with O.A., (e) visitation between O.A. and E.A., and (f) participation in the enhanced visiting program. Mother also filed an order for prisoner's appearance at hearings affecting parental rights; a prisoner's statement regarding appearance at hearing affecting parental rights on February 28, 2014; and copies of various articles on the parent project and the get on the bus program. In addition, mother filed a copy of her application, dated December 16, 2013, for services through the California Institution for Women (CIW) enhanced visiting program. The juvenile court granted mother's request to appear by telephone at the PPR hearing on February 28, 2014.

On February 20, 2014, CFS filed a PPR hearing report stating that O.A. continued to do well in her foster home and had bonded with her foster family. O.A. stated that she wanted her foster family to obtain guardianship of her and she did not want to move from

15

her foster home.  O.A. has been in her current foster home since April 19, 2013.  Her foster family speaks primarily Spanish.  O.A. has embraced the Hispanic culture of her foster family.

O.A. has not reported any self-harm thoughts and her foster mother did not report any concerns regarding O.A. having paranoia, hallucinations or suicidal ideation.  O.A. was offered a CASA, which O.A. declined.  She continued receiving mentoring services from the inter-agency youth resiliency team.

O.A. told the social worker she did not want to visit mother in prison.  Before O.A.'s supervised telephone conversation with mother on December 16, 2013, O.A. told the social worker she was apprehensive about speaking with mother and did not know what to say to her.  After the conversation, the social worker asked O.A. why most of her responses to mother's questions were untrue.  O.A. said she did not want mother to ask her "why" or continue questioning her.  On January 14, 2014, O.A. told the social worker she did not want another phone call with mother.  O.A. did not have any additional phone conversations with mother because O.A. was opposed to the phone calls.

CFS further reported that O.A. is healthy, is in eighth grade, and is doing well in school.  Dr. Cho sees O.A. monthly for monitoring her mental health.  She currently is taking Risperdal 0.5 mg to target psychosis and Zoloft 100 mg for depression.  The goal is to keep O.A. on Zoloft and take her off Risperdal.  O.A. completed wraparound services and received individual therapy at Center for Healing Childhood Trauma to address O.A.'s feelings of abandonment and her feelings regarding mother.  O.A. does not want to continue therapy.  She is not experiencing any behavioral issues and has not

resumed therapy. A foster family agency social worker visited O.A. weekly. The social worker reported O.A. enjoyed a nurturing relationship with her foster family. The social worker also reported O.A. was taking her medication daily to treat her depression and was responding well to the medication. O.A. is not currently eligible to participate in independent living plan (ILP) services. She is too young for emancipation. Although O.A. wants her foster family to obtain legal guardianship of her, her foster parents would like O.A. to remain in their home in long-term foster care. CFS concluded PPLA remained the most appropriate plan for O.A.

On February 26, 2014, CFS filed an application regarding psychotropic medication, form JV 220, requesting that O.A. continue taking Zoloft 100 mg for depression. CFS also requested O.A. also be permitted to take Benadryl as needed at bedtime. CFS reported that O.A. had stopped taking Risperdal. The form states that O.A. agreed to continue taking the medication and her caregiver also agreed to O.A. taking the medication. A consulting physician's statement approving the medication request was included with the psychotropic medication application. Mother was provided notice of the medication application.

During the PPR hearing on February 28, 2014, O.A. stated that she did not like visits (phone visits) with mother, did not want to visit mother in prison, did not want to write to mother, and did not want to receive letters from mother. O.A. said that her medication was okay. At the hearing, mother requested phone visits. She also requested O.A. participate in the "Get on the Bus Mother's Day Event" and enhanced visiting program at the prison. Mother said she wanted to develop a connection with O.A. and

17

bond with her. At the time of the hearing, O.A. had been out of mother's care for nine years. Mother also requested that her relatives be permitted to visit O.A. The court granted relative visitation, conditioned upon O.A. consenting to it. O.A. said she did not want to visit with relatives. In addition, mother wanted O.A. to stop taking medication.

Mother informed the court that during her last telephone conversation with O.A. in December 2013, O.A. asked her why mother was in prison and mother did not feel she could fully respond to the question because she did not know how much she could tell O.A. The court asked O.A. if she wanted mother to tell her why she was in prison. O.A. said yes, and the court told mother to tell her. Mother said O.A., mother and father were in the car, when father started shooting out of the car while mother was driving. Father then pointed the gun at mother and told her to continue driving.

The court noted that it had encouraged O.A. to engage in contact with mother, whose anticipated release was in 2016. The court added that O.A.'s own actions ultimately would determine whether she maintained a relationship with mother. Mother requested telephonic conjoint therapy with O.A. The court responded that O.A. was not in therapy and denied mother's request for telephonic conjoint therapy, concluding it was beyond the court's resources and would not be effective. The court adopted the CFS recommended findings and orders. The court granted the psychotropic medication request for O.A. and found there was no adult available to become O.A.'s guardian. The court ordered O.A. remain in her current foster home with a plan of PPLA. The court

18

continued the existing order allowing supervised letter and telephone contact with mother. The court continued the matter to August 29, 2014, for a PPR hearing.[5]

On April 2, 2014, mother filed a notice of appeal of the February 28, 2014 order – "particularly in regards to visitation with the minor and administration of psychotropic medications to the minor."

III

2013 PSYCHOTROPIC MEDICATION ORDER

Mother contends substantial evidence does not support the juvenile court's order on May 17, 2013, and subsequent orders authorizing the administration of psychotropic medication to O.A.

A. *Background Facts Regarding Psychotropic Medication*

In December 2011, LACFS reported that O.A. was experiencing serious mental health issues. O.A.'s therapist stated that over the past year O.A. had revealed repressed memories of incidents that occurred when she was with her parents. These memories were resurfacing and causing anxiety and paranoia. The court ordered O.A. undergo a psychiatric examination. O.A. was diagnosed with psychosis and prescribed Risperdal on March 1, 2012. LACFS submitted a request to the juvenile court on March 7, 2012, for administration of Risperdal. Mother did not object to the request, and the court approved the case plan, which included providing O.A. with counseling, a psychotropic medication

---

[5] On September 10, 2014, mother filed a notice of appeal of the August 29, 2014 order (case No. E061875).

19

evaluation, and monitoring. LACFS and O.A.'s attorney reported that, since O.A. began taking Risperdal, O.A.'s mental condition had improved.

After the case was transferred from Los Angeles County to San Bernardino County, CFS reported in November 2012, that O.A. was being evaluated for psychotropic medication and Dr. Multani had prescribed Risperdal. The CFS health report indicated O.A. began taking Risperdal on October 3, 2012. CFS reported in February 2013, O.A. was seen monthly by Dr. Multani and CFS had submitted an application for a physician's supporting statement for psychotropic medication (Physician's Assessment JV 220 A form).

On March 7, 2013, O.A. was placed on hold under section 5150, released on March 14, and readmitted the next day. CFS prepared an Application Regarding Psychotropic Medication (form JV 220), dated March 13, 2013, requesting O.A. be permitted to continue taking Risperdal and begin taking Zoloft for depression. The request form was based on Dr. Murdoch's evaluation of O.A. on March 13, 2013, while O.A. was hospitalized under section 5150. O.A. was diagnosed with "Major Depressive Disorder, Severe, Recurrent with Psychotic Features." The psychotropic medication request form, however, was not filed with the juvenile court until May 15, 2013. On March 28, 2013, O.A. began taking Zoloft, in addition to Risperdal.

At the review hearing on May 7, 2013, mother objected to O.A. taking psychotropic medication. The court stated it did not have mother's opposition, filed on April 11, 2013. O.A.'s attorney stated she had not received mother's opposition. The court therefore continued the matter.

20

On May 15, 2013, CFS filed its application for psychotropic medication for Zoloft and Risperdal, along with a consulting physician's statement stating that the proposed medication was appropriate. The application was granted on May 17, 2013. On May 21, 2013, mother filed a second Opposition to the Application Regarding Psychotropic Medication (form JV-222). Mother stated she was resubmitting her April 2013 opposition because the court indicated at the May 7, 2013 hearing that her opposition was not in the court file. Mother wanted to know why O.A. had been receiving psychotropic medication since March 2013, without prior court approval.

On June 11, 2013, at the jurisdiction/disposition hearing, mother requested the psychotropic medication be immediately discontinued or, alternatively, gradually stopped. The court requested CFS to provide the court with DBH's recommendation on whether to decrease O.A.'s Risperdal and Zoloft dosages. On June 25, 2013, Dr. Cho evaluated O.A. and recommended O.A. continue on Zoloft (100 mg) and Risperdal (2 mg), and begin taking Benadryl for insomnia.

On July 16, 2013, the juvenile court held a nonappearance review, ordered all prior orders remain in full force and effect, and referred O.A. to DBH. On July 18, 2013, mother filed another notice of objection to O.A. taking psychotropic medication, and in August 2013, mother filed her section 388 petition requesting the jurisdiction/disposition order on June 11, 2013, modified to terminate administration of psychotropic medication to O.A.

On September 6, 2013, DBH assessor, Dr. Galang-Feather, reported that O.A.'s foster mother believed O.A. had improved while in her care. She was less fearful, got

21

along with others better, and was happy. Dr. Galang-Feather noted that Dr. Cho diagnosed O.A. with Major Depressive Disorder, recurrent, severe with psychotic features, and recommended O.A. continue her medications of Risperdal and Zoloft. Dr. Cho was planning on decreasing the dosage of Risperdal if O.A. continued to do well, and added Benadryl for insomnia. Dr. Galang-Feather agreed with attempting to decrease Risperdal and possibly stop it, administer Benadryl if O.A. had recurring sleep problems, and continue the Zoloft.

At the hearing on October 15, 2013, the juvenile court denied mother's section 388 petition request to change O.A.'s medication plan. The court stated, however, it wanted to closely monitor the administering of psychotropic medications. The court ordered CFS to submit a packet in 60 days on O.A.'s status, behavior, and medication.

*B. Appeal of May 17 and June 11, 2013 Orders Authorizing Psychotropic Medication*

In mother's appellant's opening brief, she asserts that O.A. began taking Risperdal before CFS properly obtained court approval for administering psychotropic medication to O.A. under section 369.5. O.A. began taking the medication months before mother was given proper notice and before the court authorized administering the medication. In addition, mother argues CFS's application for psychotropic medication did not discuss the negative side effects of the drugs. Mother also argues that she established in her opposition that Zoloft should not be given to O.A. because it was not approved for children under 18 years old, except those suffering from Obsessive Compulsive Disorder; it can negatively affect brain development; and Zoloft can increase aggressiveness and

22

suicidal thoughts, particularly in children.  In addition, there was a medical recall and alert for Zoloft.

The record shows that, although O.A. may have begun taking Risperdal and Zoloft before the court granted approval of the CFS's application to administer psychotropic medication, the medication was approved on May 17, 2013, and there was substantial evidence supporting approval.  O.A. had an extensive history of suffering from severe mental problems and her treating physicians and therapist had all been in favor of O.A. receiving the medication.  There was also evidence that O.A.'s mental condition significantly improved after she began taking the medication.  The record shows that the medications' potential side effects were disclosed to the court and mother, and mother provided the court with information on side effects, as well, in her opposition to the applications for psychotropic medication.  Mother has not established by means of reliable expert opinion evidence that the risk of potential side effects from the medication outweighed the benefits of O.A. taking psychotropic medication, which was universally recommended by O.A.'s health care providers and those evaluating O.A.

Furthermore, mother's objections to the juvenile court's May 17, 2013 order granting CFS's application for psychotropic medication is moot because the order expired after six months,[6] and the May 17 and June 11, 2013 orders were superseded by

---

[6] California Rules of Court rule 5.640, subdivision (f), provides:  "If the court grants the request or modifies and then grants the request, the order for authorization is effective until terminated or modified by court order or until 180 days from the order, whichever is earlier.  If a progress review is set, it may be by an appearance hearing or a report to the court and parties and attorneys, at the discretion of the court."

23

the August 30, 2013 and October 15, 2013 orders, in which the court ordered continuation of the existing psychotropic medication orders. After the court granted the psychotropic medication application in May 2013, O.A. was reevaluated by Dr. Cho on June 25, 2013, and by Dr. Galang-Feather on August 28, 2013, who both recommended O.A. continue taking Risperdal, Zoloft, and Benadryl, but suggested attempting to decrease Risperdal, if appropriate.

## C. Appeal of October 15, 2013 Order Denying Mother's Section 388 Petition

Mother contends in her supplemental appellant's opening brief that the juvenile court abused its discretion in denying her section 388 petition seeking modification of the June 11, 2013 order authorizing administration of psychotropic medication to O.A.

### 1. Applicable law

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The parent bears the burden to show both '"a legitimate change of circumstances"' and that undoing the prior order would be in the best interest of the child. [Citation.] The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion. [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959-960 [Fourth Dist., Div. Two].)

In evaluating whether mother met her burden to show changed circumstances, the trial court should consider: (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of

24

relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.) These factors become less significant once reunification services have been terminated, as in the instant case. This is because, "[a]fter the termination of reunification services, . . . 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

### 2. Discussion

Mother stated in her section 388 petition filed in August 2013, that circumstances had changed after the court granted administration of psychotropic medication to O.A. on May 17, 2013, and ordered the medication continued at the jurisdiction/disposition hearing on June 11, 2013. Mother said she recently received a notice that O.A.'s medication was being increased. Risperdal was being increased from 2 mg to 6 mg per day, and Zoloft was being increased from 100 mg to 200 mg, with Benadryl added for insomnia. But the record does not support any significant changed circumstances in this regard.

On June 11, 2013, the court ordered O.A. referred to DBH for an assessment regarding continuing her psychotropic medications. On June 25, 2013, Dr. Cho at DBH evaluated O.A. and maintained her on Zoloft 100 mg once a day and Risperdal 2 mg once a day, which was the same dosage approved May 17 and June 11, 2013. At the July 16, 2013, nonappearance review of O.A.'s psychotropic medications, the juvenile court confirmed Dr. Cho's assessment and current medication status. The August 7, 2013 CFS

25

Health and Education Passport report also states that O.A.'s dosage for Zoloft remained 100 mg, beginning in March 2013, and O.A.'s dosage for Risperdal remained 2 mg, beginning in October 2012, as recommended by Dr. Cho. The September 2013 DBH assessment report indicates Drs. Cho and Galang-Feather suggested attempting to decrease O.A.'s Risperdal dosage if O.A. continued to do well.

At the hearing on mother's section 388 petition on October 15, 2013, the juvenile court therefore denied mother's request to stop the psychotropic medications but did not preclude the possibility of a reduction. The court ordered that CFS was to submit a packet within 60 days regarding O.A.'s behavior, along with a medication report regarding the possibility of reducing O.A.'s medication dosages. The record shows mother did not establish O.A.'s medication dosages were increased, nor did she establish that it was in O.A.'s best interest to decrease or stop her medication. Although there was evidence O.A.'s mental condition had improved, this may have been because of the psychotropic medication. Mother has not established that there would not be any adverse effects, such as O.A. regressing, if she stopped taking the medication. Physicians suggested trying a reduction, and the court therefore ordered an evaluation and recommendation regarding doing so. The juvenile court's October 15, 2013 order denying modification of the June 11, 2013 order regarding administering psychotropic medication was appropriate and therefore not an abuse of discretion.

IV

2013 VISITATION ORDERS

Mother appeals the June 11 and October 15, 2013 visitation orders. These orders are the same, with the exception the June 11 order, not only prohibited in-prison visitation, but also prohibited mother contacting O.A. by correspondence and phone unless O.A. requested such contact. The October 15, 2013 order modified the June 11 order by ordering CFS to schedule supervised phone calls for mother and allow monitored correspondence. Mother's objection to the June 11, 2013 visitation order is moot because it was superseded by the October 15, 2013 visitation order.

*October 15, 2013 Order*

As to mother's appeal of the October 15, 2013 order regarding visitation, mother cites *In re Julie M.* (1999) 69 Cal.App.4th 41, 49-50, for the proposition that permitting O.A. to decide for herself whether she wanted to receive mother's calls and correspondence was an improper delegation of discretion. But the juvenile court's order on October 15, 2013, was not an improper "abdication of governmental responsibility," "[g]iving [O.A.] unbridled discretion to control visitation." (*Id.* at pp. 49-50.)

*Phone Calls and Letters*

On October 15, 2013, the court authorized monitored correspondence and telephone calls, with ultimate discretion placed with CFS, as to scheduling phone calls and allowing O.A. to receive mother's letters, if appropriate. Although the court and mother acknowledged O.A. could not be forced to talk to mother, the court did not

delegate discretion to O.A. as to allowing mother's calls and letters. Rather, the court ordered CFS to facilitate mother's phone calls to O.A. and exchange of letters.

During the hearing on October 15, 2013, mother told the court she wanted O.A.'s phone number to call her and scheduled phone calls with O.A. The social worker stated she had offered O.A. the opportunity to speak with mother on the phone and O.A. declined the offer. Mother conceded at the hearing, "I believe the discretion should be allowed to my daughter." The court responded that it was allowing mother to have phone calls with O.A. but the court could not force O.A. to talk to mother on the phone. Mother replied that she understood this but wanted contact with O.A. or things would get worse. The court agreed and ordered "Phone call and letters supervised and scheduled by Social Worker. Schedule a phone call, and say, 'I'm calling your mother,' and hand her the phone. She can talk or not." The court then granted mother's section 388 petition with regard to modifying the June 11, 2013 order to all monitored letters and phone calls.

The court order stated: "Visitation: social worker authorized to supervise and schedule letter and telephone contact with mother while in custody." The court left discretion in the CFS to schedule letter and telephone contact. On October 15, 2013, the court thus granted modification of the June 11, 2013 visitation order by no longer conditioning mother's calls and correspondence on O.A. requesting them. We therefore reject mother's contention that the juvenile court improperly delegated to O.A. the authority to decide whether mother could call O.A. and send her letters. We also note that mother did not object in her notice of appeal, to the October 15, 2013 order authorizing phone calls and letters.

28

*Changed Circumstances*

With regard to the October 15, 2013 order denying modification of the June 11, 2013 order denying in-prison visitation, we conclude there was no abuse of discretion, since mother failed to show changed circumstances or that granting mother's section 388 petition to allow in-prison visitation was in O.A.'s best interests. (*In re S.J., supra,* 167 Cal.App.4th at pp. 959-960; *In re Stephanie M., supra,* 7 Cal.4th at p. 317.) Mother did not establish any change of circumstances regarding visitation, between June 11, 2013, and the hearing on the section 388 petition on October 15, 2013. Mother still was in prison and O.A. continued to say she did not want to visit mother in prison. O.A. also had indicated she did not want to talk to mother on the phone. As to monitored correspondence and phone calls, the October 15, 2013 order permitted them, if appropriate.

*Best interests*

Mother also has not established that modifying the June 11, 2013 visitation prohibiting in-prison visitation was in O.A.'s best interests. Mother argues the court applied the wrong standard of review by finding visitation was not in O.A.'s best interests. We disagree. Although the juvenile court is required to apply the detriment standard under section 366.26, subdivision (c)(4)(C), when ruling on visitation, the best interest standard applied here because the court was ruling on mother's section 388 petition. Even if the detriment standard applies, essentially the same evidence relied on in applying the best interests standard supported a finding of detriment.

29

The court's finding that it was not in O.A.'s best interests to grant mother's section 388 petition request to modify the June 11, 2013 in-prison visitation order was supported by overwhelming evidence. There was evidence O.A.'s attorney, treating physicians, therapist, foster mother, and the social worker all agreed that in-prison visitation should not be permitted and would be potentially detrimental to O.A.

Mother argues that Dr. Galang-Feather's recommendation O.A. participate in family therapy supports a finding that in-prison visitation was in O.A.'s best interests. But Dr. Galang-Feather's reference in her report to family therapy most likely did not refer to family therapy with O.A.'s biological parents while they were in prison but, rather, referred to therapy with her foster family. Dr. Galang-Feather did not recommend in her report that O.A. have any contact with mother, and noted that O.A., who was 13 years old, told Dr. Galang-Feather that she chose not to write mother and felt upset when she thought about what mother had done. O.A. had expressed fear of visiting mother in prison and a desire not to speak to mother. The juvenile court appropriately took into consideration O.A.'s fragile mental state, her expressed desires, and the emotional trauma visitation would likely have on O.A. We conclude there was no abuse of discretion in denying mother's section 388 petition request to modify the June 11, 2013 in-prison visitation order.

V

SECTION 388 PETITION

Mother asserts in her supplemental appellant's opening brief that the juvenile court abused its discretion in denying her section 388 petition seeking modification of the

30

June 11, 2013 order denying assessment of mother's friend, F.S., for placement. Mother argues that this was an abuse of discretion because F.S. qualified as a nonrelated extended family member (NREFM) and placing O.A. with her was in O.A.'s best interests.

*A. Factual Background*

On June 11, 2013, at the jurisdiction/disposition hearing on the section 387 supplemental petition, the court ordered O.A. removed from her legal guardians, Aunt and Uncle. Mother requested F.S. be assessed for a concurrent planning home. The social worker informed the court F.S. had called her and had said the last time F.S. had seen O.A. was about four years ago. In addition, O.A. had told the social worker O.A. did not remember F.S. and was not sure about being placed with her. The court rejected mother's request F.S. be assessed for a concurrent planning home, and ordered a planned permanent living arrangement in which O.A. was to remain with her current foster mother, A.S.

In August 2013, mother filed her section 388 petition, requesting modification of the June 11, 2003 order denying assessment of F.S. for placement. CFS reported in its response to mother's section 388 petition that in May 2013, F.S. had contacted CFS and requested O.A. placed with her. F.S. said she had been O.A.'s day care provider for about four years and was a long-time friend of mother. O.A. had also spent the summer with F.S. in 2009. F.S. had also provided respite care for O.A. for about two months in 2006. On June 3, 2013, the social worker told O.A. mother would like O.A. placed with F.S. O.A. said she did not remember F.S. But on October 7, 2013, O.A. said she

31

remembered she had lived with F.S. for a short time. O.A. did not recall how long she was there or her age. O.A. stated, "'I don't have good memories of living with her.'" O.A. did not elaborate. O.A. said she did not want to live with F.S.

At the hearing on October 15, 2013, on mother's section 388 petition, the court denied mother's petition to modify the June 11, 2013 order for the purpose of allowing an assessment of F.S.'s home for possible placement.

*B. Applicable Law*

The court must make orders for the care and custody of a child adjudged a dependent child. (§ 361, subd. (a).) When a child is ordered removed from his or her parents, the court must place the child under the supervision of the social worker, who may make any one of four specified placements. (§ 361.2, subd. (e).) The only placement option relevant here is: "[t]he approved home of a nonrelative extended family member [NREFM] as defined in Section 362.7." (§ 361.2, subd. (e)(3).) "In 1995, recognizing the importance of continuity of community, school, church and friends to dependent children who have been removed from their families, the Legislature enacted section 362.7, which permits a county welfare department to place a dependent child in the home of a NREFM. [Citations.]" (*In re Michael E.* (2013) 213 Cal.App.4th 670, 674; *Samantha T. v. Superior Court* (2011) 197 Cal.App.4th 94, 108.) Section 362.7 defines a NREFM as "any adult caregiver who has an established familial or mentoring relationship with the child. The county welfare department shall verify the existence of a relationship through interviews with the parent and child or with one or more third

parties. The parties may include relatives of the child, teachers, medical professionals, clergy, neighbors, and family friends."

*C. Discussion*

Mother cites *In re Michael E., supra,* 213 Cal.App.4th 670 for the proposition the juvenile court abused its discretion in rejecting her request to assess F.S. for placement as a NREFM. Relying on *Samantha T. v. Superior Court, supra,* 197 Cal.App.4th 94, the court in *Michael E., supra,* stated: "An NREFM placement may be appropriate in cases where the child does not have an existing relationship with the individual seeking NREFM status, if that individual has a close connection with the child's family and placement will further the legislative goals of allowing the child to remain in familiar surroundings, facilitating family reunification or providing a culturally sensitive environment to the child.[] [Citation.] Thus an individual may qualify as a NREFM under the express terms of the statute or within the legislative goals of the statute. [Citation.]" (*Michael E.,* at p. 675.) Any placement must also be in the child's best interest. (*Ibid.*)

In *Michael E.,* the incarcerated father requested the juvenile court to order his fiancée assessed for placement of his son. Father's fiancée was the mother of the child's infant half-sibling, but had never met father's son. The court in *Michael E.* concluded it was not an abuse of discretion for the juvenile court to deny ordering an assessment of father's fiancée on the grounds the fiancée did not personally come forward to request the child's placement in her home, the five-year-old child had been living with foster parents for five months and developed a close relationship with them, the fiancée did not live in

33

the same part of town as the foster parents, and placement with the fiancée would disrupt the child's schooling and continuity of care in a familiar environment.  The court in *Michael E.* concluded:  "Absent a need for a change of placement, placing [the child] with someone he did not know would not be in his best interests.  [Citation.]"  (*In re Michael E., supra,* 213 Cal.App.4th at p. 676.)

Here, at the time of the hearing on October 15, 2013, O.A. had lived with her foster mother, A.S., for six months, was happy in her foster home, had bonded with her foster family, and did not want to move.  In addition, O.A. stated she did not want to live with F.S., did not remember her initially, did not have fond memories of living with her, and had not seen her for over four years.  Also, mother did not establish that F.S. had a close connection with the child's family or that placement would "further the legislative goals of allowing the child to remain in familiar surroundings, facilitating family reunification or providing a culturally sensitive environment to the child."  (*In re Michael E., supra,* 213 Cal.App.4th at p. 675.)  The court could reasonably conclude placement with F.S. was not in O.A.'s best interest.  (*Ibid.*)  NREFM placement does not override O.A.'s interest in continuing in a stable nonrelative placement.  Furthermore, there was no showing of changed circumstances, which was also required in order for mother to prevail on her section 388 petition to change the June 11, 2013 order denying mother's request to assess F.S. for placement.  The juvenile court therefore did not abuse its discretion in denying mother's section 388 petition seeking modification of the June 11, 2013 order denying assessment of F.S. for placement.

34

**THIRD CONSOLIDATED APPEAL (CASE NO. E060958)**

VI

CFS'S REQUEST FOR DISMISSAL OF APPEAL

In response to mother's third appeal filed in this court (case No. E060958), CFS argues that this court should (1) grant CFS's motion to incorporate the prior appellate decisions in this case or, alternatively, grant CFS's motion for judicial notice of the decisions; and (2) grant CFS's motion to dismiss the appeal in case No. E060958. This court has already considered and ruled on CFS's motions, which were filed separately from CFS's respondent's brief. The motions contain the same arguments to dismiss raised in CFS's respondent's brief. On September 16, 2014, this court granted CFS's request for judicial notice of the numerous previous appellate decisions in this matter, and denied without prejudice CFS's other motions, including CFS's motion to dismiss mother's appeal in case No. E060958. Mother has filed eight appeals, including five in the second district court and three in this court. In addition, mother has filed two petitions for California Supreme Court review, which were denied, and recently filed a ninth appeal in this court (E061875), which will be decided separately from the three consolidated appeals decided in this decision.[7]

---

**[7] List of Mother's Appeals:**

1.a.  *In re E.A. & O.A.* (11/13/06) 2006 Cal.App.Unpub. LEXIS 10240 [Second Dist., Div. Three, B189905]

1.b.  *In re E.A. & O.A.* (2/14/07) pet. for rev. denied, 2007 Cal.LEXIS 1581 [CA Supreme Ct, S149227]

2.  *O.A. v. April A.* (5/20/08) 2008 Cal.App.Unpub. LEXIS 4096 [Second Dist., Div. Three, B202585]

*[footnote continued on next page]*

We note CFS's arguments raised in its motion to dismiss are not entirely without merit and, since this court denied CFS's motion to dismiss without prejudice, the arguments may be reconsidered in the future, in the event this court finds mother has filed repetitious appeals which raise arguments this court or the Second District Court of Appeal has already considered and rejected in this matter.

VII

THERAPY

Mother challenges the February 28, 2014 PPR order denying mother's request O.A. be provided with therapy, particularly mother/daughter conjoint therapy. Mother contends substantial evidence did not support the juvenile court's denial of therapeutic services for O.A. Mother asserts the court violated its duty to ensure CFS provided O.A. with adequate services, including appropriate mental health care. (§§ 366.3, subd. (e)(6),

---

*[footnote continued from previous page]*

3.      *In re E.A.* (9/23/09) 2009 Cal.App.Unpub. LEXIS 7614 [Second Dist., Div. Three, B215026]

4.a.      *In re E.A.* (5/11/11) pet. for rev. denied, 2013 Cal. LEXIS 4459 [CA Supreme Ct, S191515]

4.b.      *In re E.A.* (1/18/11) appeal dismissed due to abandonment [Second Dist., B225693]

5.a      *In re. O.A.* (6/6/13) appeal dismissed b/c repetitious litigation of same issues [Second Dist., B245834]

5.b      *In re O.A.* (9/11/13) pet. for rev. denied, 2013 Cal. LEXIS 7446 [CA Supreme Ct, S212193]

6.      *In re O.A.*, pending in this court, filed 7/11/2013 [E059174]
        (Appealed June 11, 2013 order)

7.      *In re O.A.*, pending in this court, filed 11/14/2013 [second appeal c/w E059174]
        (Appealed October 15, 2013 order)

8.      *In re O.A.*, pending in this court, filed 4/2/2014 [E060958 c/w E059174]

9.      *In re O.A.*, just filed in this court on 9/10/2014 [E061875]

16503, subd. (a).) CFS argues mother forfeited her objection to the court not ordering conjoint therapy or individual therapy by not raising the objection in the juvenile court. Mother, however, did request conjoint therapy by telephone and therefore her objection regarding conjoint therapy was not forfeited.

Under sections 366.3, subdivision (e)(6), and 16503, subdivision (a), the juvenile court was required to determine at the PPR hearing on February 28, 2014, whether O.A. was receiving adequate services and order appropriate services. Mother argues that the juvenile court should have ordered conjoint mother/daughter therapy services and individual therapy for O.A., based on O.A.'s history of severe mental illness, O.A.'s former therapist recommending therapy, and Dr. Galang-Feather recommending individual and family therapy.

The juvenile court was not required to order conjoint therapy under the facts in this case. There was substantial evidence that, although a year before the February 2014 PPR hearing, O.A. was suffering from serious mental issues, after her hospitalization in March 2013, O.A.'s condition had greatly improved and she was doing well by February 2014. O.A. had stabilized on effective medication, moved to an appropriate foster home, completed six months of wraparound services, and attended eight individualized therapy sessions. Furthermore, O.A., who was 14 years old at the time of the February 2014 PPR hearing, had stated several times that she no longer wanted to attend therapy and she did not want to see or have any contact with mother. In addition, O.A.'s therapist and the CFS social worker recommended that O.A. not be required to visit mother or have

37

contact with her unless O.A. wanted to do so. Under such circumstances, the juvenile court appropriately rejected mother's request for conjoint therapy.

Mother argues that conjoint therapy was necessary and therefore should have been ordered because O.A. needed to resolve her conflicts with mother, which interfered with O.A.'s relationship with mother. But there was substantial evidence it would have been counterproductive, harmful, and not in O.A.'s best interests to force O.A. to participate in conjoint therapy, when O.A. clearly and repeatedly indicated she did not want to participate in additional therapy or have any contact with mother.

Mother's reliance on *Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, for the proposition the juvenile court erred in failing to order conjoint therapy is misplaced. In *Nahid H.*, the children were separated from their mother when the mother sent her children to the United States from war-torn Iraq. Mother escaped Iraq four years later. Because the children were placed in foster care and one of the children was sexually abused, the children were angry at mother and did not want to have any contact with her or live with her. The juvenile court conditioned the mother's contact with the children upon the children requesting contact. The *Nahid H.* court reversed, concluding there had been no psychological evaluations or therapy ascertaining and ameliorating the causes of the estrangement between the mother and children. The court also stated it was improper for the juvenile court to give the children veto power over contact with mother. (*Id.* at pp. 1070-1071.)

Unlike in *Nahid H.*, in the instant case, mother had been incarcerated for 10 years and her release is not anticipated until 2016. It was not possible for O.A. to live with

38

mother while mother was incarcerated and O.A.'s therapist recommended O.A. not visit mother in prison or be forced to have contact with her. The record also shows that CFS provided O.A. with many years of therapy and made a concerted effort to provide O.A. with services to assist her in remaining connected with mother during mother's lengthy incarceration.

Although O.A.'s therapist and Dr. Galang-Feather recommended continued therapy, they did not recommend conjoint therapy between mother and O.A. Dr. Galang-Feather includes in her list of recommendations, "Family therapy," but there is no discussion regarding this recommendation in her report and it is unclear as to whether she is recommending therapy between O.A. and O.A.'s foster family, as opposed to therapy involving parents, who are both incarcerated. It was reasonable for the juvenile court to reject conjoint therapy, since mother was incarcerated, and O.A. did not want to participate in therapy or have contact with mother. O.A. had not visited with mother since her incarceration in 2005, and O.A. was doing well, after struggling with serious mental illness.

Furthermore, even though the juvenile court did not order CFS to provide conjoint therapy services, O.A. was not precluded from receiving individualized therapy in the event CFS or the court concluded O.A. needed it and O.A. requested it. O.A.'s case plan included general counseling and psychiatric monitoring. The juvenile court ordered that CFS was authorized to consent to routine medical, mental health, and dental care by a licensed practitioner and release information to Healthy Homes Center for Healing Childhood Trauma and Christian Counseling Services necessary to obtain medical,

mental, or dental care for O.A. In addition, CFS, the Foster Care Agency, and the DBH continued to monitor O.A.'s placement, mental health and emotional well-being in order to ensure O.A. received appropriate and adequate services. Although mother suggested at the 2014 PPR hearing that individual therapy would be beneficial, she did not request it for O.A. and therefore forfeited her objection on appeal. Even if not forfeited, the juvenile court did not err in not ordering therapy since there was substantial evidence O.A. was doing well, was being monitored by her doctor, and did not want to participate in therapy at that time. The court could have reasonably concluded that under such circumstances forcing O.A. to participate in therapy was not necessary and not in O.A.'s best interests.

## VIII

## DELEGATION OF VISITATION AUTHORITY

Mother contends the trial court ruling on February 28, 2014, denying face-to-face visitation, improperly delegated the juvenile court's authority to O.A. to determine whether visitation would occur. We disagree.

During the February 2014 PPR hearing, the juvenile court noted that the court had previously encouraged O.A. to engage in contact with mother. The court added that it ultimately was up to O.A. to take action to maintain a relationship with mother. The court denied mother's request for telephonic conjoint therapy, continued the existing orders allowing supervised letter and telephone contact with mother, and adopted CFS's recommended orders, which did not include an order allowing face-to-face visitation with mother.

40

In support of mother's challenge to the February 28, 2014 ruling denying face-to-face visitation, mother argues the juvenile court's following statements demonstrate the court improperly delegated its visitation authority to O.A.:

"[O.A.], I have encouraged you in the past to engage in visitation or contact with your mother, and I'm not really seeing much has changed with that. [¶] So Social Worker, please continue to talk to [O.A.] about visitation with her mother, phone, telephone, and this special program at the prison that the mother has attached, "Get on the Bus," to see if [O.A.] wants to participate in that."

The juvenile court further stated:

"The only thing I can tell you, [mother], is that we're all encouraging [O.A.] to keep a relationship with you, but ultimately, it is going to be her own actions – [¶] . . . as far as following through on that relationship . . . ."

When the juvenile court made these statements, the court did not give O.A. sole discretion to decide whether to visit mother. The court simply indicated that the court and CFS were encouraging O.A. to maintain a relationship with mother and interact with her; that CFS should not force O.A. to visit or have contact with mother; and that O.A.'s actions ultimately would determine whether O.A. maintained a relationship with mother.

In section IV of this opinion we address and reject mother's similar objections to the June 11 and October 15, 2013, visitation orders. Mother provides no material new facts or grounds for finding an abuse of discretion and reversing the juvenile court's February 2014 PPR order. Mother remains incarcerated; O.A. is opposed to visiting her; social workers and therapists advise against ordering O.A. visit mother in prison; and

41

under *In re Danielle W.* (1989) 207 Cal.App.3d 1227 (*Danielle W.*), there was no improper delegation of the juvenile court's visitation authority to O.A.

Mother argues the instant case is distinguishable from *Danielle W.*, in which the court upheld the juvenile court visitation order, observing: "[A]ppellant mischaracterizes the juvenile court's visitation order: the juvenile court did not delegate all control over visitation. The juvenile court, rather than ordering no visitation at all (despite evidence to support a finding that visitation by appellant would be detrimental to and not in the best interests of the children), ordered visitation under specific conditions." (*Danielle W., supra,* 207 Cal.App.3d at p. 1233.)

In *Danielle W., supra,* 207 Cal.App.3d at pages 1230-1239, the mother in a juvenile dependency case, appealed from the visitation portion of the disposition order. The mother argued that the order delegated all control over visitation to the social worker and the two children and therefore was an abuse of discretion, a denial of due process, an unauthorized delegation of judicial power, and an extra jurisdictional act. The court in *Danielle W.* affirmed the juvenile court order, holding that the court did not improperly delegate judicial power to the children or the department. The children were only authorized to express their desires regarding visitation and the department was authorized to determine the specifics of how visitation would take place. (*Id.* at p. 1237.)

In concluding the visitation order in *Danielle W.* was not an improper delegation of control over visitation, the court stated: "[T]he visitation order does not represent an improper delegation of judicial power. First, there is no delegation of judicial power to the children even though the order states in part that visitation is at the discretion of the

42

minors. In the context of this case, this means the children should not be forced to visit with their mother against their will and in no way suggests that the minors are authorized to do more than express their desires in this regard. Second, the order simply authorizes the Department to administer the details of visitation, as specified by the court. Although the order grants the Department some discretion to determine whether a specific proposed visit would be in the best interests of the child, the dominant factor in the exercise of that discretion is the desire of the child to visit the mother. [¶] . . . [¶] We point out, however, that a visitation order granting the Department *complete* and *total discretion* to determine whether or not visitation occurs would be invalid. . . . The juvenile court must first determine whether or not visitation should occur, as was done here, and then provide the Department with guidelines as to the prerequisites of visitation or any limitations or required circumstances." (*Danielle W., supra,* 207 Cal.App.3d at p. 1237.)

Here, the court did not improperly delegate to O.A. complete and total discretion to determine whether or not visitation occurred. The court encouraged O.A. to interact with mother and provided guidelines to be followed by CFS when determining whether to allow mother to visit or contact O.A. As in *Danielle W.*, the court indicated that CFS was not to force O.A. to visit or have contact with mother if she did not wish to do so. Mother has not demonstrated an improper delegation of the court's authority.

In *Danielle W.*, the court stated that, "In considering the best interests of the child, while still recognizing parental visitation rights, the juvenile court did in fact order visitation, under the one circumstance that would offer the best possibility that such visitation would be beneficial — when the child desired such contact." (*Danielle W.,*

43

*supra,* 207 Cal.App.3d at pp. 1238-1239.)  The *Danielle W.* court noted that the order provided protection of the minor's psychological well-being.  (*Id.* at p. 1239.)  Likewise, here, the court indicated it was encouraging O.A. to interact with mother and would allow visitation if O.A. agreed to it but did not authorize forced visitation of any kind.  As in *Danielle W.*, the juvenile court in the instant case did not improperly delegate its visitation authority to O.A.  The court merely directed CFS not to force O.A. to visit mother or have contact with her if O.A. was opposed to it.

Mother argues that during the February 2014 PPR hearing, the juvenile court improperly prohibited, not only personal visitation, but also telephone and written contact.  This is not correct.  The court did not prohibit telephone and written contact.  The court previously authorized phone and letter contact and, at the February 2014 PPR hearing continued the order.  At the February 2014 PPR hearing, the court indicated that, since O.A. had stated she did not want to participate in phone or letter contact with mother, CFS should not force O.A. to participate in telephone and written contact with mother.

Mother further argues that under section 366.26, subdivision (c)(4)(C), the juvenile court's denial of visitation must be reversed because the juvenile court did not make a finding of detriment.  Section 366.26, subdivision (c)(4)(C) states that "[t]he court shall also make an order for visitation with the parents or guardians unless the court finds by a preponderance of the evidence that the visitation would be detrimental to the physical or emotional well-being of the child."  This objection has already been addressed and rejected in one of mother's previous appeals in this matter (case No.

44

202585), in which the Second District Court of Appeal stated: "Moreover, visitation is not an essential part of a case when the parent does not have reunification services. (*In re J.N.* (2006) 138 Cal.App.4th 450, 458-459.) Section 361.5, subdivision (f), gives the dependency court discretion as to whether visitation will be ordered when reunification services are not granted because of, among things, a violent felony conviction. The exception to such exercise of discretion is that visitation is not allowed if it would be detrimental to the minor. (*In re J.N., supra,* 138 Cal.App.4th at p. 458.) Mother misreads section 361.5, subdivision (f), when she asserts that '[v]isitation may only be denied upon a finding that visitation would be detrimental to the child.' That is not what the statute says, and Mother's citation to *In re J.N.* to support her misreading of the statute also misreads what the *In re J.N.* court said about those provisions. (*In re J.N.,* at p. 458.)" (*In re O.A.*, 2008 Cal.App.Unpub. LEXIS 4096, 31-32 (Cal.App.2d Dist., 2008).)

Furthermore, the record is replete with evidence supporting a finding that forcing O.A. to participate in visitation, whether it be personal visitation or contact by telephone or letter, would be detrimental to O.A. Her therapists, physicians, and social worker's opinions had indicated that forcing visitation would be detrimental to O.A. This was sufficient to support the juvenile court's visitation order, in which the court directed CFS not to force O.A. to participate in visitation if she objected to it.

# IX

## PLACEMENT

Mother contends there was insufficient evidence to support the juvenile court's finding at the February 28, 2014 PPR hearing that there was no adult available to become O.A.'s guardian. Mother argues that the juvenile court should have found that F.S. was qualified and available to become O.A.'s guardian.

O.A.'s permanent plan at the time of the hearing was a PPLA. Under section 366.3, the juvenile court was required to determine "[t]he continuing appropriateness and extent of compliance with the permanent plan for the child, including . . . efforts to identify a prospective adoptive parent or legal guardian . . . ." (§ 366.3, subd. (e)(3).) Mother maintains that the juvenile court erred in continuing to refuse to acknowledge that F.S. qualified as a prospective legal guardian. F.S. was seeking placement of O.A. and such placement could entail a more permanent plan of guardianship.

Mother raised essentially these same arguments in her appeal to the juvenile court's June 11, 2013 order denying assessment of F.S. for placement (case No. 59174). As discussed in section V of this opinion, mother argued F.S. qualified as a NREFM and placing O.A. with her was in O.A.'s best interests. In section V, we conclude the juvenile court reasonably concluded placement with F.S. was not in O.A.'s best interest and placing O.A. with F.S. did not override O.A.'s interest in continuing in a stable nonrelative placement.

For the same reasons mentioned in section V, we reject mother's objection to the February 28, 2014 finding there was no adult available to become O.A.'s guardian. The

46

juvenile court reasonably found, based on substantial evidence, as discussed in section V of this opinion, that F.S. did not qualify as a suitable guardian for O.A. O.A. did not have favorable memories of living with F.S. when O.A. was five or six years old and did not want to live with her. Furthermore, O.A. was happy in her current PPLA placement and wanted to remain there. There was more than ample evidence to support the juvenile court's rejection of F.S. as an available, qualified guardian for O.A.

X

2014 PSYCHOTROPIC MEDICATION ORDER

Mother raises the same objections to the juvenile court order allowing administration of psychotropic drugs to O.A., as raised in her previous appeals, including the two appeals consolidated with mother's appeal of the February 28, 2014 order. Mother states in her appellate opening brief in case No. E060958 that, "[a]s [mother] explained in her earlier appeals, the evidence provided the juvenile court regarding the propriety of the administration of psychotropic drugs was woefully inadequate." Mother therefore concludes the February 28, 2014 order allowing provision of psychotropic drugs to O.A. must be reversed. Mother argues the February 26, 2014 medication application did not properly contain the required information regarding potential side effects of the medication on a child of O.A.'s age.

The February 26, 2014 application requested administration of Zoloft for depression and Benadryl for insomnia. Attached to the application were two medication fact sheets, one for each medication, which discussed common side effects. There was also attached to the application a consulting physician's statement indicating the

47

proposed medication was "generally appropriate." Mother provided the court with medical information that the requested medication increased suicidal thoughts, and this symptom is more common in children. On February 28, 2014, the court granted CFS's psychotropic medication application. Mother argues that because the medication request did not address all potential side effects, such as increased suicidal thoughts, the court did not have sufficient evidence upon which to determine whether the medication was appropriate for O.A. In addition, mother argues, as she has in previous appeals, that there was no evidence Zoloft is effective when given to a child and the court failed to consider alternatives to medication, such as therapy. Mother further asserts that CFS's medication application was untimely. CFS claimed in its February 26, 2014 application that the application was an emergency application because the earlier medication order was about to expire. Mother argues there was no emergency. CFS merely failed to timely file an application, by waiting until shortly before expiration of the earlier order, and then rushing approval of the new application, thereby impeding proper consideration of the application.

For the same reasons discussed in mother's previous appeals and in section III of this opinion regarding mother's appeal of the May 17 and October 13, 2013 orders, we reject mother's challenge to the juvenile court order approving administering psychotropic medication (Zoloft and Benadryl).

We further conclude there was substantial evidence supporting the juvenile court's order authorizing administration of psychotropic medication to O.A. Such evidence included the medication application statement of prescribing physician, Dr. Cho, that

48

stopping the "medications may mean decompensation leading to psychiatric hospitalization and jeopardize placement." According to the application, O.A. has been taking Zoloft for depression since May 2013, and Benadryl, as needed for insomnia, since September 2013, with no known medical problems. O.A., who is 14 years old, consented to taking the medications and is reportedly doing well. She is free from hallucinations and therefore is no longer taking Risperdal. Dr. Cho has been monitoring O.A. monthly and recommended the medication in February 2014. The medication application was approved by court consultant, psychiatrist Dr. Galang-Feather. Mother has not established it is in O.A.'s best interests to stop the medication or that the February 28, 2014 medication order was improper, inappropriate or an abuse of discretion.

## XI

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

McKINSTER

Acting P. J.

RICHLI

J.

49